In re CENTURY OFFSHORE MANAGE-
MENT CORPORATION, Debtor.

UNITED STATES of America,
Plaintiff–Appellant,

v.

CENTURY OFFSHORE MANAGEMENT
CORPORATION, Defendant–
Appellee.

No. 95–6320.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 17, 1996.

Decided April 14, 1997.

Robert L. Klarquist, William B. Lazarus (argued and briefed), U.S. Department of Justice, Land & Natural Resources Division, Washington, DC, J. Christopher Kohn, Tracy J. Whitaker, Sidney P. Levinson, Office of the Department of Justice, Civil Division, Washington, DC, for Plaintiff–Appellant.

Solomon L. Van Meter, Wyatt, Tarrant & Combs, Lexington, KY, Jerry E. Rothrock (argued and briefed), Akin, Gump, Strauss, Hauer & Feld, Washington, DC, H. Rey Stroube, III, Akin, Gump, Strauss, Hauer & Feld, Houston, TX, for Defendant–Appellee.

Kelly S. Brooks (briefed), New Mexico State Land Office, Santa Fe, NM, for Amicus Curiae Commissioner of Public Lands for the State of New Mexico.

Frederick C. Whitrock, Asst. Atty, General (briefed), Louisiana Department of Natural Resources, Civil Division, Baton Rouge, LA, for amici curiae State of Louisiana, Louisiana Department of Natural Resources.

Before: MERRITT, JONES, and COLE, Circuit Judges.

MERRITT, Circuit Judge.

## SUMMARY

This case arises from the bankruptcy of Century Offshore Management Corporation, a natural gas producer and the lessee of federally-owned submerged lands in the Gulf of Mexico. Century sold gas to Enron Gas Marketing, Inc. under five– and five-and-a-half-year, fixed price contracts. The Minerals Management Service of the United States Department of the Interior seeks to obtain $1,855,004 in royalties on a $12,250,000 lump sum payment Enron made to Century to terminate these contracts and replace them with new contracts based on current, floating market prices. The bankruptcy and district courts denied the government's royalty claim because they concluded that the lump sum payment was not a payment for the "production" of gas but merely a settlement payment designed simply to terminate the original contracts. The issue of statutory interpretation before us is whether this lump sum payment is properly attributable to "the amount or value of the production [of natural gas] saved, removed, or sold" under § 1337 of the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331–1356 (1996). We conclude that the transaction, viewed as a whole, was clearly linked to gas "production saved, removed or sold," and we therefore reverse the decision of the courts below. An up-front payment made in exchange for a substituted contract that changes the price of the old contract, followed by new purchases, is a sufficient cause of new production of gas to qualify as "production sold" under the Act.

## I.

In the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. §§ 1331–1356 (1996), Congress authorized the Department of the Interior to issue leases providing for the development of federal oil and gas resources on submerged lands on the outer continental shelf and gave the Department the authority to prescribe rules and regulations necessary to carry out the Act's leasing provisions. 43 U.S.C. § 1334(a) (1996). Since 1982, the Secretary of the Interior has delegated the administrative responsibility for outer continental shelf leases to the Minerals Management Service.

The Act authorizes the Department of the Interior to grant oil and gas leases to "the highest responsible qualified bidder" and presents a menu of payment approaches

from which the Department may choose before the bidding begins. *Id.* § 1337(a)(1). The first of these options—the one used in the instant case—provides for a royalty of a fixed percentage of "the amount or value of the production saved, removed, or sold" by the lessee. *Id.* § 1337(a)(1)(A).

The Department of the Interior has the sole authority to prescribe regulations necessary to carry out the provisions of the Act. *Id.* § 1334(a). As part of its administration of the Act, the Department has adopted the "gross proceeds" rule, a broad view of "the amount or value of . . . production." Under the Department's interpretation, "under no circumstances shall the value of production for royalty purposes be less than the gross proceeds accruing to the lessee for lease production, less applicable allowances." 30 C.F.R. § 206.152(h) (1996). The Department has applied the "gross proceeds" rule to offshore leases since its initial implementation of the Act. It has also, in turn, adopted a broad definition of "gross proceeds": "Gross proceeds . . . means the *total monies and other consideration* accruing to an oil and gas lessee for the disposition of the oil [or gas] produced." 30 C.F.R. § 206.151 (1996) (emphasis added).

Century, the debtor in this case, acquired working interests in the leases at issue in this litigation—known as West Cameron Block 368, South Timbalier Block 107, and Breton Sound Block 53—in 1987, 1989, and 1990. All are located in the Gulf of Mexico off the coast of Louisiana. All of these leases incorporate the "amount or value of production saved, removed or sold" language of the statute. ST 107 Lease at 2 (J.A. at 60); WC 368 Lease at 2 (J.A. at 67); BS 53 Lease at 1 (J.A. at 72). Two of the leases—South Timbalier Block 107 and West Cameron Block 368—expressly invoke the "gross proceeds"

language of the regulation, stating that the amount of production "shall not be deemed to be less than the gross proceeds accruing to the Lessee from the sale thereof." ST 107 Lease at 2 (J.A. at 60); WC 368 Lease at 2 (J.A. at 67).

In 1989 and 1990, Century entered into production contracts with Enron Gas Marketing, Inc., under which Enron agreed to purchase gas produced from these leases. First, Enron and Century entered into "base contracts" covering an initial quantity of gas. For the purposes of this case, the base contracts had two important features: They were fixed price contracts, under which Enron agreed to purchase certain minimum quantities of gas for a fixed price; and they contained "take-or-pay" provisions. In other words, Enron was required to pay Century the price of the minimum purchase quantity, even if it did not choose to take any gas.[1] Unlike some standard take-or-pay provisions, these payments for gas not taken were non-recoupable: If Enron were to make a payment for gas not taken one month, and then take more gas than the minimum purchase quantity the next month, the excess gas would not entitle Enron to a refund of a portion of the previous month's payment. In other words, once made, Enron's payments under the take-or-pay clause were gone for good.

The base contracts covered a certain minimum quantity of gas. At the same time, Century and Enron entered into "excess contracts" for additional gas produced from the leases in question. In contrast to the base contracts, the excess contracts provided for floating prices tied to the spot price of natural gas. They did not contain take-or-pay provisions.

---

1. Enron agreed to purchase a minimum quantity of gas each month, defined as follows:

 "Minimum Purchase Quantity", for any Month during the term of this Agreement, shall mean the minimum quantity of Gas, expressed in MMBtus per day, that Buyer is obligated to purchase and receive, or pay for if available and not taken, during such Month, which quantity shall be ninety percent (90%) of the [maximum daily quantity] times the number of days in such month.

Gas Purchase Agreement, South Timbalier Block 107, at 2 (J.A. at 96).

Take-or-pay requirements provide a producer with a minimum cash flow in exchange for reserving its gas production for a purchaser. Take-or-pay requirements are a form of what economists call "demand charges": charges for reserving the option to use. In contrast, charges for the quantity of the gas used are "commodity charges." *See* John S. Lowe, *Defining the Royalty Obligation*, 49 S.M.U.L.REV. 223, 267 (1996).

In late 1991, Enron approached Century with a proposal to purchase the 1989 and 1990 contracts. On February 12, 1992, Enron and Century entered into the agreement that has given rise to the current dispute. Enron agreed to make a lump sum payment to Century of $12,250,000, in return for which Enron was relieved of its obligation to make further payments under the base contracts. At the time of the agreement, Enron did not owe Century any accrued "pay" payments under the take-or-pay clause. Century did not pay royalties to the federal government on any portion of the lump sum payment. But after receiving warnings from its bank about possible royalty liability, Century required Enron to agree to loan Century up to $1.5 million in case the government demanded royalties.

Simultaneously, Enron and Century entered into new contracts, which have become known as the "replacement contracts." These replacement contracts provided for floating prices, fixed to the spot price for natural gas. They did not provide for any minimum quantity, and lacked take-or-pay provisions. The preamble to these contracts expressly noted the parties' "desire to replace and supercede" the previous agreements. *E.g.*, Gas Purchase Contract, Breton Sound Blocks 45 and 52, at 1 (J.A. at 183). Under the replacement contracts, Enron purchased virtually all of the gas identified in the original agreements, within the same time period.

In August of 1992, Hurricane Andrew caused extensive damage to Century's platforms in the Gulf. A year later, it filed for bankruptcy under Chapter 11 of the United States Bankruptcy Code. The United States then filed a proof of claim for $1,855,004, the full royalty that would be due on production worth $12,250,000, the amount of Enron's lump sum payment. In this adversary proceeding, the United States and Century each filed motions for summary judgment. The bankruptcy court ruled in Century's favor across the board, holding that the government's royalty claim exceeded its statutory authority, and that the government's interpretation of the gross proceeds rule was arbitrary and capricious, unlawfully retroactive, and adopted in violation of the Administrative Procedure Act's notice and comment requirement. The district court affirmed on all grounds except the last.

The government makes several arguments in support of its position that Century owes royalties on the lump sum payment. First, the government notes that courts must defer to an agency's reasonable interpretation of the statutes which it is entrusted to enforce. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). Within this context, it asserts that Enron made the lump sum payment to obtain a reduced price for future gas purchases. Such an advance payment for future gas, it concludes, would be analogous to an installment payment and clearly linked to the value of production under the statute. It also contends that even if the payment did not serve to obtain a reduced price, it was still "total monies and other consideration" under the government's broad interpretation of the statute and regulations.[2] As a matter of timing, the government seeks royalties on the payment as production occurs under the replacement contracts, not at the time the payment was made.

Century responds that Enron did not make the lump sum payment to reduce the price of future gas purchases. Rather, Century contends, the payment was based on "calculations of the present value of the non-recoupable take-or-pay payments that Enron would owe Century if Enron failed to purchase the minimum gas volumes required

---

**2.** The government contends that even if Century and Enron had not entered into the replacement contracts—for example, if Enron had "bought out" the original contracts and walked away—Century would owe royalties on Enron's lump sum payment as it produced (and sold to *other* pipelines or end-users) the gas identified in the original contracts. *See* Appellants' Br. at 12–13; *see also Shell Offshore, Inc.*, MMS–91–0087–OCS (Sept. 2, 1994) at 19; Letter from James W. Shaw, Associate Director for Royalty Management, MMS, to "Payor" (May 3, 1993). We emphasize, for reasons discussed below, that this is not the issue presented in the instant case, where Century and Enron continued their relationship under the replacement contracts. Thus we express no opinion on this aspect of the government's argument.

during the remaining terms" of the original contracts. Appellee's Br. at 20. Placing emphasis on the fact that Enron was not obligated to take any gas under the replacement contracts, Century characterizes the lump-sum payment as a "buy-out," unrelated for royalty purposes to the simultaneous replacement contracts. Century also contends that the Fifth Circuit's decision in *Diamond Shamrock Exploration Co. v. Hodel*, 853 F.2d 1159 (5th Cir.1988), supports its position, and is binding on the government through the Minerals Management Service's acquiescence. Century asserts that *Diamond Shamrock* stands for the proposition that royalties are only due on payments made to purchase gas, and that this payment does not fall into that category. Century concludes that the government's current stance is arbitrary, capricious, and inconsistent with prior agency positions. Finally, Century claims that the government's interpretation of the "gross proceeds" rule is unlawfully retroactive.

## II.

■ The government and Century both contend that their respective characterizations of the lump-sum payment flow naturally from the nature of the payment and the circumstances surrounding it. As they frame the issue, we are to determine whether the payment was a "buy-down" of the original contracts' price terms or a "buy-out" of their take-or-pay clauses. Neither characterization adequately and fully describes this payment, however. As the Louisiana Supreme Court stated in *Frey v. Amoco Production Co.*, 603 So.2d 166 (La.1992): "Total

revenue under a gas purchase contract is a function of quantity and price.... Because the producer is willing to negotiate a lower price in exchange for the guarantee the pipeline will either take or pay for a specific minimum quantity of natural gas, the take-or-pay provision effectively lowers the price the producer charges the pipeline per unit of gas." *Id.* at 180. Thus, we decline to advance the fiction that some portion of this payment is clearly allocable to one purpose, and the remainder allocable to another purpose.

■ The termination of the 1989 and 1990 contracts and the creation of the replacement contracts are one transaction for the purposes of the instant dispute.[3] Their timing and plain language—including the parties' stated intent to "replace and supercede" the terminated contracts—make this interpretation the only reasonable conclusion.[4] Viewed in this light, the transaction is akin to a substituted contract, *see* RESTATEMENT (SECOND) OF CONTRACTS § 279 (1979), under which Enron agreed to pay Century an advance payment for a new requirements contract. Faced *ab initio* with a simple requirements contract, we would not examine the monthly payments required under that contract to determine the proportion of the payment allocable to contractual, risk-allocating provisions and separate it from that allocable to pure "price." Similarly, were such a requirements contract to provide for an advance payment rather than monthly payments or payment upon delivery, we would not subject the advance payment to this bifurcated analysis (though the government

**3.** This conclusion stems from our interpretation of the contracts. As such, it is a matter of law subject to *de novo* review by this Court. *First Am. Bank v. Fidelity & Deposit Co.*, 5 F.3d 982, 984 (6th Cir.1993).

**4.** Century's explanation of the parties' intent is not persuasive. Century contends that the amount of the payment represented only the present value of the payments Enron would be required to pay under the take-or-pay provisions of the base contracts. Appellee's Br. at 20. Yet the depositions of employees of Century and its bank, the Bank of Montreal, fail to support this conclusion. Moreover, it is nonsensical on its face: The obligation to make such payments under the take-or-pay clause would have been con-

tingent on Enron not taking any gas. At the very least, this sum would have to be discounted by the probability that Enron would not take any gas. In other words, the parties could not rationally have represented a contingent event in present value terms, without taking into account the likelihood of the occurrence of the contingency. Nothing in the record suggests that Enron had prospectively refused to take any gas under the contract. Indeed, we know that Enron eventually took virtually all the gas identified in the contract. Thus Century's characterization of the parties' intentions respecting the lump sum payment as unrelated to the substitute contract is unacceptable.

would not be entitled to its royalties until production). We see no reason to treat this case differently, where we hold that the lump sum payment contemplated and was the cause of new gas sales to be delivered in the future, where the parties intended a continuing relationship, and where much of the gas identified in the original contracts was delivered under the replacement contracts. The lump sum payment behaved as an advance payment under a substituted requirements contract. As a result, the payment was for "production sold" under the statute, and the royalty was payable when the gas was produced.

*Diamond Shamrock.* The Fifth Circuit's decision in *Diamond Shamrock Exploration Co. v. Hodel*, 853 F.2d 1159 (5th Cir.1988) is not to the contrary. *Diamond Shamrock* addressed the royalty consequences of take-or-pay payments themselves. The Fifth Circuit applied the same statutes and regulations at issue in the instant case to payments made for gas not taken in two consolidated cases. The court noted that

> [t]he issue raised is whether payments by a pipeline-purchaser to a lessee-producer of a federal oil and gas lease pursuant to a take-or-pay clause in its gas sales contract with the pipeline-purchaser are subject to payment of a royalty when the take-or-pay payment is received, not as value for gas actually taken, but as part of the take-or-pay obligation under the contract.

*Id.* at 1161. The Fifth Circuit concluded that "royalty payments are not due on take-or-pay payments and are only due on gas actually produced and taken." *Id.* It based its decision on the fact that the relevant statutes, regulations, and lease provisions all linked royalties to the value of production "saved, removed or sold" from the leased property. "The agency's regulations do not refer to 'gross proceeds' in the abstract," noted the court,

> but only to gross proceeds that accrue to the lessee from the disposition or sale of produced substances, that is, gas actually removed and delivered to the pipeline. Consequently, royalties are not owed unless and until actual production, the sever-

ance of minerals from the formation, occurs.

*Id.* at 1166.

As an initial matter, it is important to note that the primary *practical* consequence of *Diamond Shamrock* was the timing of royalty payments. The contracts before the court allowed the pipelines to take "make-up gas" to obtain rebates of previous take-or-pay payments. For example, consider a hypothetical pipeline that is unable to take gas one month and must make payments under a take-or-pay provision for gas not taken. The next month, it takes the contractually-specified quantity of gas and hence avoids making "pay" payments. But it is also able to take additional gas over this amount. Under the contracts at issue in *Diamond Shamrock*, it would be entitled to a year-end credit equal to the amount of the previously-made take-or-pay payments. When this credit is applied to purchases of gas, it acts as a discount, but the producer still pays royalties based on the contract (or fair market) price. Thus even under *Diamond Shamrock* the government indirectly receives royalties on the take-or-pay payments themselves, but only if and when make-up gas is actually produced and taken.

Our reading of *Diamond Shamrock* suggests that the court interpreted the relevant statutes and regulations to require some nexus with production. Under the facts of that case, that nexus was not achieved until the pipelines took make-up gas. The recoupability provisions of the contracts at issue there allowed the pipelines' take-or-pay payments to be applied to this make-up gas. This nexus with production then triggered the leases' royalty provisions. This, we believe, is the most rational reading of the occasionally ambiguous *Diamond Shamrock* opinion. *Cf. Independent Petroleum Assoc. of America v. Babbitt*, 92 F.3d 1248, 1259 (D.C.Cir. 1996) (reading *Diamond Shamrock* to require a "link" between payments subject to royalty and the physical severance of gas).

As the above discussion makes clear, we believe the necessary nexus to production exists under the facts of the case before us. Here the simultaneous replacement contracts, under which we know virtually all the

previously-identified gas was taken, provide this nexus. Though this gas was not make-up gas, it is analogous to make-up gas in the sense that though it is paid after the payment at issue, it provides a link to production. Now that this gas has been produced and delivered to Enron, royalty payments are due, not merely on the price Enron ultimately paid, but on that price plus the amount of the lump sum payment allocable to the gas ultimately taken.

■ *Acquiescence.* We are not persuaded by Century's argument that the government's response to *Diamond Shamrock* foreclosed its approach to the instant case. Because *Diamond Shamrock* is not controlling on this Court, the real issue before us is the extent to which the Minerals Management Service acquiesced in that decision by altering its regulations. After the adverse outcome in *Diamond Shamrock*, rather than appealing the decision or applying it only to those leases within the Fifth Circuit, the government amended its royalty regulations to reflect it. *See* Revision of Gross Proceeds Definition in Oil and Gas Valuation Regulations, 53 Fed.Reg. 45082 (1988). It deleted a prior inclusion of take-or-pay payments as an example in its definition of "gross proceeds," but adopted a very narrow interpretation of the *Diamond Shamrock* decision, expressly noting that the changes were "consistent with, and . . . the minimum necessitated by," the Fifth Circuit's decision. *Id.* at 45084. The ruling, the agency concluded, "requires [the Minerals Management Service] to remove the requirement to pay royalties on take-or-pay payments at the time the payment is made. Of course, royalties are still due when make-up gas is taken." *Id.* at 45083.

The government never conceded, however, that it would not seek royalties once a sufficient link to production is established. *Diamond Shamrock* makes it clear that courts should look, *ex post*, at whether certain actions create a nexus with production. In *Diamond Shamrock*, unlike the instant case, one piece of paper established recoupability and hence the necessary nexus with production. Here, we are faced with two pieces of paper, which Century characterizes as inde-

pendent. But again, we are construing them together, as one transaction. Together, they provide a nexus between the lump sum payment and later production. Now that production has taken place, the government is entitled to its royalties. It is true that Enron was not absolutely obligated to take gas under the replacement contracts. But Enron did eventually take most or all of the gas. Similarly, in the recoupable take-or-pay payment situation addressed in *Diamond Shamrock*, the pipeline was not required to take make-up gas, though that action was what triggered the refunds—and as the opinion makes clear, royalties.

As discussed above, we view this transaction, taken as a whole, as an advance payment for gas. In response to *Diamond Shamrock*, the Minerals Management Service also amended its rules for advanced payments, noting that

[i]n view of the Fifth Circuit's ruling that royalty is not owed until make-up gas is actually produced and taken, it follows that no royalty is due on advanced payments until the specific gas which repays the advanced payment actually is produced.

*Id.* In the instant case, that gas has been produced, and a royalty is now due.

Finally, we note alternatively that it is difficult to see why this payment was not for production "saved" under the language of the statute. Viewing the transaction as a whole, as economic reality requires, it seems clear that the payment was made to ensure a ready source of gas for Enron under the replacement contracts. As such, this production would be "saved" for Enron's use—the very language used in the statute. Neither party advances this argument, however, and so we hold that the payment is royalty-bearing because, like an advanced payment, it is tightly linked to "production sold" later. Thus, we do not rest our holding on this ground.

## III.

■ We do not find compelling the "absurd results" that the lower courts fear would result from the outcome we reach. First, the district court argues that the gov-

ernment's interpretation of gross proceeds "would necessitate two royalty payments for one sale of natural gas in almost every case where the producer sells natural gas after the original contract is terminated." Opinion and Order, 185 B.R. 734, 741 (J.A. at 49). It is true that Century would have to pay one royalty in two components. But we fail to see how this procedure presents a problem. No double-counting would result. Indeed, the *Diamond Shamrock* opinion, on which the district court otherwise relies, contemplates a similar result. Under *Diamond Shamrock*, when a purchaser receives a discount for make-up gas, the producer must still pay a royalty on the gas's contract or market value. This royalty is in essence also one royalty with two components: One based on the discounted price currently received for make-up gas, and one based on the difference between the discounted price and the market or contract price.

■ Second, the district court notes that "as recognized by the court in *Diamond Shamrock*, the purpose of the minimum take requirements is to apportion risk between the buyer and seller of the natural gas by compensating the producer, not the owner of the minerals, for the risks associated with development and production." *Id.* at 741 (J.A. at 50). It is true that the *Diamond Shamrock* court made this observation. However, there can be no serious contention that the government acquiesced in this portion of the opinion. In addition, of course, this argument does not respond to the possibility that some or all of the payment was made to obtain lower future prices. Moreover, the district court's risk bearing conclusion is not persuasive. While it is true that take-or-pay provisions shift the risk of very low prices or low market liquidity to the buyer, which must make a minimum payment regardless of its ability to take the gas, the allocation of risk between the seller/lessee and the lessor is not as clear. A lessor receives diminished royalties from diminished exploration, production, and development. The mineral exploitation of its land involves the risk of opportunity costs, such as foregone profits from alternative uses of the land, that are borne solely by the lessor. *Cf. Frey v. Amoco Production Co.*, 603 So.2d

166, 178 (La.1992) ("[I]t is a myopic eye which perceives the lessor as sharing none of the risks associated with bringing the gas to the ground ...."), cited with approval in *Klein v. Jones*, 980 F.2d 521, 530 (8th Cir. 1992). A lease/royalty arrangement actually lies somewhere in the middle on the risk-allocation continuum. *Cf. Henry v. Ballard & Cordell Corp.*, 418 So.2d 1334, 1338 (La. 1982) ("Where the mineral lease provides for payment to the lessor of a fractional royalty interest, the lease arrangement is in the nature of a cooperative venture."). An outright sale—or more realistically, a fixed-amount lease without royalties—would have shifted more of the risks of production away from the government. Under a joint production venture, on the other hand, the government would have borne more of these risks. Thus, the district court's risk-allocation concern is not dispositive and merely begs the question at issue here. The district court's risk bearing theory is particularly unpersuasive when transferred from private parties, *see Diamond Shamrock* at 1167, to the federal government. The federal government has reasons for choosing not to act as an oil company that do not apply to private actors.

The District of Columbia Circuit's decision in *Independent Petroleum Association of America v. Babbitt*, 92 F.3d 1248 (D.C.Cir. 1996), does not compel a different result. In *Independent Petroleum Association*, the court addressed the royalty implications of a settlement payment made to Samedan Oil Corporation, a lessee of a natural gas well on Indian lands, in exchange for a compromise of accrued and prospective take-or-pay liabilities. Samedan and the purchaser, Southern Natural Gas Company, agreed to a "complete buyout." On the same day, Samedan contracted to sell the gas that was the subject of the contract with Southern to a third party. Thus *Independent Petroleum Association* addressed a situation in which a nexus with production did not exist. *See Independent Petroleum Assoc.* at 1259–60 (construing *Diamond Shamrock* to require a "link" between royalties and physical severance). It is not at all clear how the *Independent Petroleum Association* court would have dealt with the instant case, where Enron's eventual pur-

chase under the terms of a simultaneous replacement contract of virtually all the gas at issue provides a sufficient nexus to production to support the government's royalty claim.

 Century seems to suggest that a holding in favor of the government would provide a disincentive for producers and pipelines to settle accrued take-or-pay obligations or to buy out onerous take-or-pay provisions. This contention is without merit: Our holding simply requires lessees to share these payments when they are sufficiently linked to production. Indeed, in this case, Century accepted the lump sum payment and replacement contract prices despite its own uncertainty about the royalty implications of the deal. The producer will still choose to produce, at least over the short run, because it receives a marginal gain—it just shares it with the owner of the land. In addition, contrary to Century's contention, the prices it receives are no less "market" prices simply because they must reflect Century's obligations to its lessor.

It is important to remember that Century and other producers do not own the land that is the subject of these leases. In passing the Outer Continental Shelf Lands Act, Congress declared that "the outer Continental Shelf is a vital national resource reserve held by the Federal Government for the public, which should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." 43 U.S.C. § 1332 (1996). In opening these lands up for development, Congress created an opportunity for oil producers such as Century, but did not pull its hand away completely. The passage quoted above and the statute as a whole make it clear that the outer continental shelf is a special area in which the government retains a continuing interest. That the government chose not to simply walk away, cash in hand, from the production of resources on the outer shelf is demonstrated by these very leases, which provide for royalties linked to production rather than fixed payments. The government holds these lands "for the public" and as such owes duties to all its citizens.

This includes consumers and those who navigate, fish, and enjoy the beauty of the lands, not solely those who help the government exploit the lands' resources. *Cf.* William H. White, *The Right to Recover Royalties on Natural Gas Take-or-Pay Settlements,* 41 OKLA.L.REV. 663, 674 (1988) (acknowledging the argument that "[t]ake-or-pay receipts are created by the lease and the productive capacity of the property. The lessee would have no basis to obtain take-or-pay benefits but for the lease.").

## IV.

*Retroactivity.* Century claims that the government's demand for royalties is unlawfully retroactive. The lower courts both agreed with Century on this independent ground. Century argues that the government announced and applied its current approach to royalties for contract settlements in two administrative cases imposing royalty obligations on settlements of take-or-pay obligations or contractual provisions, *Shell Offshore, Inc.,* MMS-91-0087-OCS (Sept. 2, 1994) and *Samedan Oil Corp.,* MMS-94-0003-IND (Sept. 16, 1994). Because this approach was a departure from settled practice at the time, concludes Century, it should not apply to the lump sum payment in the instant case, which occurred in early 1992. We disagree.

 In *Sun Exploration and Production Co.,* 112 I.B.L.A. 373 (1990), the Interior Board of Land Appeals restricted the ability of the Minerals Management Service to depart from a previous administrative position and apply a new approach retroactively. The threshold question is whether the Minerals Management Service's construction of the gross proceeds rule in these cases was "an abrupt departure from a well-established practice," in which case retroactive application is restricted, or merely "an attempt to fill a void in an unsettled area of the law." *Id.* at 392.

In support of its argument that *Shell Offshore* and *Samedan* represented departures from established practice, Century points to the fact that the Minerals Management Service amended its royalty provisions in re-

sponse to the *Diamond Shamrock* opinion, and asserts that during the following five years the Service "consistently and repeatedly disclaimed royalties on non-recoupable settlement payments." Appellee's Br. at 45. In response, the government claims that the Department of the Interior had made no "final" or "definitive" pronouncement on the subject. Appellant's Br. at 47.

■ We hold that the government's decision to seek royalties in this case, and its decisions in *Shell Offshore* and *Samedan,* were not abrupt departures from well-established practice. The contrary agency positions cited by Century are not applicable to these facts. For example, Century refers to an internal memorandum dated November 30, 1990, in which a Minerals Management Service official considered a possible refund of royalties paid by Chevron, U.S.A. after Chevron received a "buy-out" payment from a gas purchaser. Letter from Milton K. Dial, Chief of Royalty Valuation and Standards Division, MMS, to Chief of Fiscal Accounting Division, MMS (Nov. 30, 1990). The memorandum states that "contract 'buy-out' payments received by a producer to free a purchaser from future obligations under a sales contract are not associated with production removed from the lease and, therefore, will not be subject to royalty." *Id.* Century asserts that it had a right to rely on this language when it participated in the transactions at issue in the instant case.

But, as outlined above, this case involves more than a purchaser buying out a contract and walking away from the relationship. Here, the contemporaneous replacement contracts make this transaction more akin to a buy-down, notwithstanding the parties' characterization. The Chief of Royalty Valuation's memo makes clear that buy-downs and buy-outs are to be treated differently. His memo defines a buy-out payment as one "not associated with production removed from the lease." *Id.* In contrast, we have held here that by taking the same gas under the replacement contracts, Enron provided a sufficient association with production.[5] In addi-

tion, as noted above, we believe *Diamond Shamrock* implies this conclusion. Thus we hold that at the very least the government's position here and in *Shell Offshore* and *Samedan* is merely "an attempt to fill a void in an unsettled area of the law."

## V.

■ *Notice and comment requirement of the Administrative Procedure Act.* On this issue the district court overturned the ruling of the bankruptcy court. We agree with the district court's holding that the government's issuance of *Shell Offshore* did not violate the notice and comment requirement of the Administrative Procedure Act, 5 U.S.C. § 553(b) (1996). Though an agency is ordinarily required to provide notice and an opportunity for comment before adopting a new rule, *id.,* notice and comment are not necessary when the agency issues "interpretive rules." *Shalala v. Guernsey Memorial Hospital,* 514 U.S. 87, ——, 115 S.Ct. 1232, 1239, 131 L.Ed.2d 106 (1995). An interpretive rule is one "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Id.* We agree with the district court that *Shell Offshore* "advises the public of the DOI's construction of OCSLA and the gross proceeds rule as applied to contract settlement payments," and hence that notice and comment were not required. In addition, in light of our holding that the government's approach to royalties here and in *Shell Offshore* is not an abrupt departure from well-established practice, we doubt that it is a new rule in any case.

## CONCLUSION

For the foregoing reasons, we disagree with the district court's conclusion that the government is not entitled to a royalty on the portion of the lump sum payment allocable to gas produced under the replacement contracts. We agree that the government's actions did not violate the Administrative Procedure Act. Accordingly, the district court's judgment is REVERSED in part and AF-

---

5. Notably, the memorandum also cautioned that "the circumstances leading to a contract 'buy-out' payment and the agreements under which it

is made must be reviewed to ensure that payment is tendered only in consideration of the contract termination." *Id.*

FIRMED in part, and the case is REMAND-ED to the district court, which should determine the royalty due in accordance with this opinion.