**EEX CORPORATION, Plaintiff,**

v.

**UNITED STATES DEPARTMENT OF THE INTERIOR, et al., Defendants.**

No. Civ.A. 99–2386(JHG).

United States District Court, District of Columbia.

Aug. 23, 2000.

L Poe Leggette, Fulbright & Jaworski, L.L.P, Washington, DC, for EEX Corporation, plaintiff.

Ann D. Navaro, U.S. Department of Justice, Environment & Natural Resources Div., Washington, DC, for Department of Interior, Bruce Babbitt, Secretary of the Interior, Sylvia V. Baca, Acting Assistant Secretary Land and Minerals Management/Department of the Interior, federal defendants.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

Plaintiff, EEX Corporation ("EEX"), commenced this action seeking declaratory and injunctive relief against defendants, United States Department of the Interior ("DOI" or "Interior"), Bruce Babbitt, Secretary of the Interior, and Sylvia V. Baca, Acting Assistant Secretary ("Assistant Secretary"), Department of Interior Land and Minerals Management Service ("MMS"). EEX challenges the Assistant Secretary's decision which affirmed in part and reversed in part two MMS orders requiring EEX to calculate and pay royalties on certain gas contract settlement proceeds. EEX claims the Assistant Secretary's decision was arbitrary and capricious in light of the Court of Appeals' decision in *Independent Petroleum Association of America v. Babbitt,* 92 F.3d 1248 (D.C.Cir.1996), *reh'g denied* ("*IPAA*"). The defendants claim the Assistant Secretary's decision "properly reconciles" *IPAA* with other judicial authorities "and with Interior's statutory obligation to collect royalties on the production of gas from public lands." Cross Mot. For SummJ. at 8.

Presently pending before the Court are plaintiff's motion for summary judgment and defendants' cross motion for summary judgment. For the reasons stated below,

plaintiff's motion is granted and defendants' motion is denied.[1]

### I. Factual Background

The material facts in this case are undisputed. Interior, through MMS, issues and administers leases for offshore gas and oil production under the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331, et seq. ("OCSLA").[2] Lessees under the OCSLA must pay royalties to the federal government calculated as a percentage of the "amount or value of the production saved, removed, or sold" by the lessee. *See* 43 U.S.C. § 1337(a)(1)(A). EEX was a lessee under the OCSLA during the period at issue.[3]

In or about 1969, EEX entered into numerous twenty-year term contracts with Natural Gas Pipeline Company of America ("NGPL"), to sell gas covered by EEX's various leases, including six federal OCS-LA leases, to NGPL. NGPL is a "pipeline-purchaser in the business of buying and transporting gas in interstate commerce for resale to local distribution companies." Mot. For SummJ. at 2. The contracts in question provided that NGPL was the ex-

clusive purchaser of gas produced by EEX.[4] The contracts contained "take-or-pay" provisions that required NGPL to either purchase the minimum amount of gas for each given period, or to pay for the minimum amount even if it did not take the gas. However, if NGPL made a payment for gas it did not take, it could subsequently apply that payment to gas taken in excess of the contract minimum for up to five years after the payment was made. This excess gas is called make-up gas. If NGPL did not take the make-up gas within the five-year time period, EEX kept the take-or-pay payment even though no gas was ultimately taken. In return for the take-or-pay provision, EEX agreed to dedicate its entire gas reserves to NGPL. These take-or-pay provisions were fairly common in the industry at the time EEX and NGPL contracted for them. *See Diamond Shamrock v. Hodel,* 853 F.2d 1159, 1164 (5th Cir.1988) ("Natural gas sale contracts usually contain a standard "take-or-pay" clause.").

In the mid 1980s, NGPL defaulted on its contract obligations to EEX.[5] In order to

---

1. Pursuant to LcvR 7.1(f), the defendants' request for oral argument is denied as the briefs, exhibits, and administrative record provide sufficient information for the Court to make her rulings.

2. DOI also administers and issues leases for oil and gas production on federal lands under the Mineral Leasing Act, 30 U.S.C. § 181 et. seq., and the Mineral Leasing Act for Acquired Lands, 30 U.S.C. § 351, et. seq., and for production on Indian tribal lands and Indian allotted lands under 25 U.S.C. § 396 and 25 U.S.C. §§ 396a–396g. Only the OCS-LA is at issue here.

3. EEX was formerly known as Enserch Exploration, Inc. Enserch was the managing general partner of, and successor-in-interest to, EP Operating Limited Partnership, the recipient of the contract settlement payments at issue. In addition, EEX had at least one, and maybe more, predecessors during the pendency of the contracts at issue. For ease of reference, the Court will collectively refer to all of these entities as EEX, the current party to the litigation.

4. Purchasers of gas are also known as pipelines, and lessees are also known as producers, *i.e.,* pipeline-purchasers and lessee-producers, and are sometimes referred to as such in this Opinion.

5. NGPL, like so many other gas purchasers, fell victim to the deregulation and restructuring of the natural gas industry:

   Previously, natural gas pipelines acted as gas merchants, purchasing gas at the wellhead, transporting it and selling it to local distribution companies ... and large end users. In the 1980s, after concluding that this system resulted in various market distortions and inefficiencies, the Federal Energy Regulatory Commission ("FERC") began the lengthy process of transforming pipelines from gas merchants to common carriers of gas. Along the way, Congress completed the deregulation of wellhead gas prices through the Natural Gas Wellhead Decontrol Act of 1989 ("Decontrol Act"), Pub.L No. 101–60, 103 Stat. 157. Under regulated wellhead pricing, the pipelines, consistent with FERC policy, had entered into long-term, fixed price wellhead pur-

resolve the dispute, NGPL and EEX entered into two settlement agreements occurring February 1988 and September 1988. MMS ordered EEX to calculate and pay royalties on payments associated with these settlements, and this litigation (and the underlying administrative proceedings) resulted. The Court will address the settlements and the administrative proceedings below. However, because the issue of royalty consequences on settlement payments has been the subject of prior judicial decisions, and because resolution of this matter will depend on this Court's interpretation of those decisions, a preliminary discussion of the legal background is necessary to put the administrative proceedings into context.

## II. Legal Background

### A. Diamond Shamrock and the Regulatory Background

In *Diamond Shamrock v. Hodel,* 853 F.2d 1159 (5th Cir.1988), the Fifth Circuit addressed the issue of how and whether royalties should be assessed on take-or-pay contract payments (not settlement payments). The OSCLA requires that gas leases contain a provision requiring royalties to be paid as a percentage of the "amount or value of the production saved, removed, or sold" by the lessee-producer. 43 U.S.C. § 1337(a)(1)(A), (C), & (G). MMS' general rule on royalties, known as the "gross proceeds" rule, states that "under no circumstances shall the value of production for royalty purposes be less than the gross proceeds accruing to the lessee for lease production, less applicable transportation allowances and processing allowances." 30 C.F.R. § 206.152(h). Be-

fore *Diamond Shamrock* was decided, MMS had assessed royalties on take-or-pay payments at the time the lessee-producer received the payment from the pipeline-purchaser, and not when the pipeline-purchaser took the make-up gas. Interior had reasoned that the take-or-pay payments, regardless of whether they had been recouped through make-up gas, were part of the "value of production" upon which royalties were assessed.

The Fifth Circuit disagreed, holding that take-or-pay payments cannot be considered payments for the sale of gas unless the gas is actually severed from the ground. This severance does not occur unless and until the pipeline-purchaser takes make-up gas.[6] The Court reasoned,

> [i]n the context of the gas purchase contract and industry practice, the take-or-pay payment is not intended to be a payment for gas and is not a part of the price of gas until it is applied at the time of sale. The value to the producer of take-or-pay payments forfeited by the purchaser is therefore not treated as part of the price of gas purchased currently. If the gas is made up, there has of course been a first sale and the applicable ceiling price is that in the month of delivery. We find no basis whatever to conclude that earnings which producers may realize on take-or-pay payments, whether measured by interest actually earned or by value, are part of the price paid for gas.

*Id.* at 1168. Thus, the Court held that "for purposes of royalty calculation and payment, production does not occur until the minerals are physically severed from the

chase contracts. After wellhead price deregulation the market price for gas dipped well below the long-term contract prices pipelines were committed to pay.
*IPAA,* 92 F.3d at 1251.

**6.** The gas can not be severed from the ground until it is taken by the producer because
natural gas is almost always transported by pipeline and cannot be "stored" at the lease site[. I]f a pipeline cannot accept delivery of gas, the producer must shut in his wells

or restrict production. There can be no gas produced at the time a take-or-pay payment is made because the producer has to leave in the ground reserves sufficient to meet make-up demands over the make-up period, generally five to seven years. The committed volume under the gas sales contract must remain in the reservoir for the remainder of the make-up period.
*Diamond Shamrock,* 853 F.2d at 1164.

earth." *See id.* The *Diamond Shamrock* court was persuaded by the fact that take-or-pay payments were designed to compensate the producer-lessee and not the owner of the minerals, *i.e.*, the government, for the risks associated with exploration, production and development. By leasing the lands to producers, the government passes on the burden of these costs and risks while at the same receiving the benefit through royalty payments. "[T]he take-or-pay obligation ensures to the producer a continuous source of revenue to cover investment, operations and maintenance [most of which] will continue to be incurred, regardless of whether the purchaser takes any gas. The lessee is the exclusive bearer of these risks." *Id.* at 1167.

Interior subsequently adopted the *Diamond Shamrock* decision and MMS amended its gross proceeds rule by limiting royalties only to those take-or-pay payments that are recouped through make-up gas. *See* 53 Fed.Reg. 45082, 45083 (Nov. 8, 1988) ("The Fifth Circuit's ruling [in *Diamond Shamrock*] therefore requires that MMS amend its regulations to remove the requirement to pay royalties on take-or-pay payments at the time the payment is made. Of course, royalties still are due when make-up gas is taken.").

### B. IPAA

In *IPAA*, Samedan Oil Corp. ("Samedan"), a producer-lessee, entered into a settlement to resolve outstanding take-or-pay obligations with the purchaser-pipeline, Southern Natural Gas Company ("Southern"). The settlement provided for Southern to make a lump sum payment of $100,000 to Samedan in exchange for Samedan's release of Southern from the gas purchase contract.[7] Most of the $100,000 payment was allocated as compensation to

Samedan to terminate the contract and alleviate Southern from its remaining purchase obligations. A smaller portion of the payment was allocated as compensation for take-or-pay obligations that had accrued under the contract but had not been paid by Southern. Samedan then sold the gas that would have been sold to Southern under the now terminated contract to other purchasers. MMS ordered Samedan to pay royalties on both the portion of the settlement allocated to unpaid take-or-pay liability, as well as the portion allocated for termination of future contract obligations. MMS took the position that the entire settlement payment compensated Samedan for the lower price it would be forced to take for gas that would have been sold under the higher priced Southern contract. According to MMS, "[t]he compromise payment therefore properly is regarded as a payment in anticipation of a lower price to be received by the lessee if and to the extent that the lessee later produces the volumes to which a take-or-pay payment would have been applied." *IPAA*, 92 F.3d at 1255.

Throughout the *IPAA* litigation, Interior argued that if a lump sum settlement payment is allocated toward gas that is ultimately produced (i.e., the contract gas is severed from the ground and sold after the contract has been extinguished), then that portion of the settlement payment is subject to royalties at the time of production regardless of whether the subsequent purchaser is the original party under the contract or a third party, because the benefit to the lessee is the same in either case. *Id.* at 1253. The *IPAA* court rejected Interior's interpretation and, instead of focusing on whether the gas was subsequently produced, looked to whether there was a contractual obligation of the lessee to credit the payment (settlement or take-

---

7. These types of contract settlements, where there is a termination of the existing contract and no subsequent relationship between the parties, are commonly referred to in the industry as "buyouts." *IPAA*, 92 F.3d at 1253. In a "buydown," another type of contract

settlement, the pipeline-purchaser pays a lump sum payment in exchange for revisions or amendments to the existing contract that provide for continued sale of the gas to the pipeline-producer at reduced prices. *See id.*

or-pay) to severed gas.[8] *Id.* at 1260. According to the court,

> [u]nder *Diamond Shamrock's* construction of the royalties statute as requiring a link between payments subject to royalty and the physical severance of gas, there is no meaningful distinction between a settlement payment and a recoupable take-or-pay payment in that no gas is actually produced in either case. But unlike the recoupable take-or-pay payment, a nonrecoupable settlement payment is never credited as payment for any gas actually severed from the ground. When gas is actually severed and sold to a substitute purchaser, the settlement payment does not serve as payment for the gas. The link between the funds on which royalties are claimed and the actual production of gas is missing.

*IPAA,* 92 F.3d at 1259–60.

## C. Century Offshore

Approximately eight months after *IPAA* was decided, the Sixth Circuit issued its decision in *Century Offshore Management Corp.,* 111 F.3d 443 (6th Cir.1997), *cert. denied,* 522 U.S. 1090, 118 S.Ct. 880, 139 L.Ed.2d 868 (1998). In *Century Offshore,* the lessee and purchaser terminated their existing long-term contracts and the purchaser paid a lump sum settlement payment to the lessee in exchange for a release from all future obligations under the current contract. At the time of the settlement payment, the purchaser was not in arrears on its take-or-pay obligations. The parties replaced the long term contracts with new contracts providing for the same purchaser to subsequently purchase the gas at floating prices based on the current market price, with no minimum quantity and no take-or-pay obligations. MMS assessed royalties on the settlement payment, reasoning that the payment was an advance payment for future gas. The Sixth Circuit upheld the decision, stating

> [w]e believe the necessary nexus to production exists under the facts of the case before us. Here the simultaneous replacement contracts, under which we know virtually all the previously-identified gas was taken, provide this nexus. Though this gas was not make-up gas, it is analogous to make-up gas in the sense that though it is paid after the payment at issue, it provides a link to production. Now that this gas has been produced and delivered [to the pipeline-purchaser], royalty payments are due, not merely on the price [the pipeline-purchaser] ultimately paid, but on that price plus the amount of the lump sum payment allocable to the gas ultimately taken.

*Id.,* 111 F.3d at 449–450. The court briefly noted that its decision was not in conflict with *IPAA* because *IPAA* involved a payment in exchange for accrued and future take-or-pay liabilities, a "complete buyout" of the existing contract, and a subsequent

---

**8.** The *IPAA* court concluded that the royalty assessment on the settlement payment was arbitrary and capricious under the Administrative Procedures Act ("APA"), in light of DOI's determination after *Diamond Shamrock* that take-or-pay payments are not royalty bearing In determining the appropriate standard of review of DOI's action, the *IPAA* court held that the case falls within the "overlap" between deferential review under *Chevron, U.S.A., Inc. v. Natural Resources,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and arbitrary and capricious review under the APA, 5 U.S.C. § 706(2)(A). The Court noted on the one hand, that "[u]nder *Chevron,* DOI's interpretation of the gross proceeds rule is held only to a standard of reasonableness, but the interpretation must be reasonable in light of DOI's adoption of *Diamond Shamrock.*" *IPAA,* 92 F.3d at 1258. On the other hand, the Court noted that under the APA, DOI's "decision must satisfy the arbitrary and capricious standard 'insofar as it treats contract settlement payments differently from the way it treats take-or-pay payments under *Diamond Shamrock.*" *Id.* Nonetheless, the Court determined that the result would be the same under either analytic framework and ruled that "if DOI's interpretation of the gross proceeds rule is unreasonable [under *Chevron*] it is unreasonable because the application of that interpretation in the case of take-or-pay settlement payments constitutes an unexplained [*i.e.,* arbitrary and capricious] departure from the agency's adoption of *Diamond Shamrock.*" *Id.*

sale of the gas to third parties.[9] *See id.* at 451–52. In *Century Offshore*, the court was persuaded by the fact that the new contract between the producer and the original purchaser acted as a "substituted requirements contract" in that the parties "intended a continuing relationship, and . . . much of the gas identified in the original contracts was delivered under the replacement contracts" to the original purchaser. *Id.* at 449.

### III. Administrative Proceedings

#### A.  The Settlements

EEX and NGPL entered into two settlement agreements, one in February 1998 and one in September 1988. The material terms of the settlement agreements are not in dispute.

#### 1.  February 1988

The February settlement resolved 32 long term gas contracts between EEX and NGPL, six of which involved federal leases. NGPL paid to EEX a lump sum cash payment of $333,525 to resolve price disputes not related to the federal leases. In addition, NGPL agreed to transfer to EEX two natural gas gathering systems valued at $625,775 in exchange for EEX releasing NGPL from its take-or-pay liabilities accrued through December 31, 1986, and reducing the contract minimum take requirements to sixty percent of maximum deliverability for 1987. In addition, the settlement provided for termination of several contracts, including two involving federal leases, and amendment of the maximum pricing provisions on six of the contracts.

#### 2.  September 1988

The September 1988 settlement covered 28 gas purchase contracts, four of which were the same federal properties involved in the February 1988 settlement. NGPL paid a lump sum "one-time, non-recoupable payment" to EEX in the amount of $6,450,000, *see* A.R. at 80; 813–14 [10], in exchange for the mutual release from all take-or-pay and other contract liability accrued through September 1988, the termination of nineteen existing contracts, and the modification or replacement of nine contracts (including the four contracts subject to federal leases) with a new omnibus contract agreement dated October 1, 1988. Under the omnibus contract agreement, NGPL would make a firm offer to purchase EEX's gas production for the month at a "price which Buyer [NGPL] believes in good faith to be necessary to enable Buyer to resell the gas" at the current market prices. *See* A.R. at 890. EEX may, within one business day after receiving NGPL's firm offer, accept the offer or make a counter-offer. If a counter-offer is made and NGPL rejects it, all gas production subject to the contract is released and available for sale on the open market. NGPL ultimately purchased "approximately 46 per cent of the production at significantly lower prices than those prescribed by the original contracts. The remaining volumes were sold to third party spot market purchasers." *See* A.R. at 5.

#### B.  The Administrative Proceedings

MMS conducted an audit of the February and September 1988 settlements to determine if royalties had been properly calculated and paid by EEX. On October 4, 1994, MMS issued two separate (and nearly identical) orders concerning the February and September settlements as they pertain to the federal OCSLA leases. MMS stated that royalties were due on the

---

**9.** Interior argued in *Century Offshore* that even if the lessee and original purchaser did not enter into the replacement contract and the original purchaser had bought out the contract and "walked away" the lessee would still owe royalties on the settlement payments because the gas identified in the original con-

tract would ultimately be sold to other producers. *See Century Offshore,* 111 F.3d at 447 n. 2. The court did not decide the issue.

**10.** "A.R." refers to the Administrative Record contained in MMS–94–0631–OCS.

portions of the settlement payment attributable to the accrued take-or-pay liabilities because "that portion of the settlement . . . relates in part to the gas which the purchaser had the right to take under the make-up provisions of the original contract." A.R. at 40. MMS also stated that royalties were due on the portion of the settlement payment attributed to the "buy-down" (*i.e.*, contract modification), because the payment reduces the price to be paid for future production and becomes royalty bearing when future production occurs. *See id.* With respect to payments allocated to the "buy-out" (*i.e.*, contract termination) provision, MMS ruled that "those payments are royalty bearing as, and to the extent that, production of the 'bought out' volumes continues under any successor contract during the term of the original contract." A.R. at 46. In other words, according to MMS,

> payments received under contract settlement agreements are royalty bearing if the mineral to which the payment is attributable is produced and sold either to the *original purchaser or a substitute purchaser.* Therefore, the settlement proceeds relating to take-or-pay recoupment and buydown/buyout portion of the settlement that were directly attributable to production from the Federal leases are royalty bearing.

A.R. at 47 (emphasis in original).

EEX appealed MMS' decision to the Acting Assistant Secretary of DOI who granted in part and denied in part EEX's appeals from MMS' orders. The Assistant Secretary, relying on *IPAA* and *Mobil Exploration and Producing U.S., Inc.,* MMS–94–0151–0CS (1998) (holding that settlement payments to satisfy accrued, but unpaid take-or-pay liabilities and to extinguish future contract obligations that involved no subsequent sales to the same purchaser are not royalty bearing), rescinded those portions of the orders requiring EEX to pay royalties on the settlement proceeds allocable to the accrued but unpaid take-or-pay liabilities. In addition,

the Assistant Secretary rescinded "the portion of the orders that required the appellant to calculate and pay royalties on the proceeds allocable to termination of the original contracts where no production was sold to the same purchaser (or affiliate of the same purchaser) after the settlement." A.R. at 6.

However, based on the Sixth Circuit's holding in *Century Offshore*, the Assistant Secretary denied EEX's appeal concerning the portion of the settlement proceeds traceable to the 46 percent production resold to NGPL under the September 1988 settlement and subsequent omnibus contract agreement. The Assistant Secretary held

> the replacement and amended contracts and the evidence of post-settlement sales of the covered production under those contracts to NGPL constitute clear evidence in the record of a continuing sales relationship in the covered gas between the parties after the settlement. Accordingly, with respect to those sales to NGPL, we find a continuing sales relationship sufficient under *Century* to establish that the parties to the September 88 settlement considered part of the settlement payment to be consideration for contract price reformation.

A.R. 7. EEX appealed to this Court the Assistant Secretary's decision as it pertains to the assessment of royalties on the settlement proceeds traceable to the subsequent sale of gas to NGPL after the settlement.

### IV. Analysis

*A. Standard of Review*

■ Actions of administrative agencies are reviewed in accordance with the APA under the arbitrary and capricious standard of review. *See* 5 U.S.C. § 706(2)(A). The agency's "legal determinations [are reviewed] *de novo,* according substantial deference to the agency's interpretation of the statutes and regulations it administers." *Vue v. Immigration and Natural-*

*ization Serv.*, 92 F.3d 696, 699 (8th Cir. 1996) (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). "However, deference 'is only appropriate when the agency has exercised its *own* judgment. When, instead, the agency's decision is based on an erroneous view of the law, its decision cannot stand.'" *See Transitional Hospitals Corp. of Louisiana, Inc., et al. v. Shalala, et al.*, 222 F.3d 1019, 1023 (D.C.Cir.2000) (citing *Phillips Petroleum Co. v. FERC*, 792 F.2d 1165, 1169 (D.C.Cir. 1986) (emphasis in original)).

Here, the agency's interpretation of the statute and regulations has been reviewed by the Court of Appeals and this Court must determine if the agency acted arbitrarily and capriciously in applying *IPAA* in the manner it did. *See Maislin Industries, U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990) ("Once we have determined a statute's clear meaning, we adhere to that determination under the doctrine of stare decisis, and we judge an agency's later interpretation of the statute against our prior determination of the statute's meaning.").[11]

## B. Discussion

■ Interior has attempted to reconcile *IPAA* and *Century Offshore* by interpreting the cases as together standing for the proposition that a nexus to production sufficient to establish royalty consequences exists when there is a continuing sales relationship between the original parties after the settlement payment, but not when the relationship is terminated. Interior argues that the holding in *IPAA* is limited to situations where there is a termination of the original contract and no subsequent relationship between the producer and original purchaser. EEX argues that *IPAA* is not so limited and applies to situations where there is a subsequent purchase of gas from the producer by the original purchaser. This Court agrees with EEX.

The *IPAA* court read *Diamond Shamrock* (as adopted by Interior) as permitting only one result from nonrecoupable settlement or take-or-pay payments, and that is that no royalties can accrue on payments that are not recouped through severance and production of make-up gas. In other words, contrary to defendant's position, the *IPAA* court focused not on whether the relationship between the producer and purchaser is terminated, but rather, as plaintiffs argue, on whether the settlement payment is recouped and specifically attributed to severed gas. As the Court noted, "a nonrecoupable settlement payment is never credited as payment for any gas actually severed from the ground. When gas is actually severed and sold to a substitute purchaser the settlement payment does not serve as payment for the gas." *IPAA*, 92 F.3d at 1259–60.

Nonrecoupable settlement payments, rather than serving as credits for make-up gas are, in the words of Judge Rogers, payments for "freed-up" gas, *i.e.*, gas the lessee would not have been able to sell without the settlement. *Id.* at 1265 (Rogers, J. dissenting). The gas is "freed-up" regardless of the identity of the subsequent purchaser. Here, the "freed-up" gas was not transformed into a credit for severed gas solely because NGPL was the successful bidder 46 percent of the time. *See Black Butte Coal Co. v. United States*, 38 F.Supp.2d 963, 973 (D.Wyo.1999) ("[J]ust because a mineral commodity is ultimately purchased and sold to the same party who made a prior payment to the producer, the prior payment does not become royalty bearing" absent recoupment

---

**11.** Although urged by the appellants in *IPAA* to apply *Maislin* to the agency's interpretation of *Diamond Shamrock*, the *IPAA* court refused to do so on the ground that the Fifth Circuit's decision was not binding authority on the District of Columbia Circuit. *IPAA* is binding authority on this Court.

or credit toward the later price paid for the gas after it is severed from the ground.). If settlement payments are to be considered royalty bearing when attributed to "freed-up" gas that is later sold, it logically follows that all of the gas subject to the original contract, and not just that purchased by the original purchaser, must be royalty bearing. But *IPAA* precludes this.

The Court recognizes that her interpretation of *IPAA* may conflict with the Six Circuit's decision in *Century Offshore*. The plaintiffs go to great lengths to convince this Court that *Century Offshore* can be distinguished from *IPAA* on the ground that *Century Offshore* involved facts unique to that case. For example, in *Century Offshore*, unlike in *IPAA*, the purchaser was not in arrears on its take-or-pay obligations at the time of the settlement and there was no indication a breach would occur in the future. The parties canceled the existing contract and simultaneously entered into a new contract reducing the price for future gas to be taken by the same producer at reduced rates. According to EEX, the settlement in *Century Offshore* differs from the settlement in *IPAA* (and the settlement here) because it was not a settlement for breach of past or future take-or-pay obligations, but rather an attempt by the parties to circumvent their royalty obligations. The plaintiffs have some support from case law in this district and the district of Wyoming. In *Independent Petroleum Association of America v. Babbitt,* 971 F.Supp. 19 (D.D.C.1997), Judge Lamberth suggested there was no conflict between *Century Off-*

shore and *IPAA* because in *Century Offshore* the Sixth Circuit "saw through" the parties "attempt to avoid make-up contracts, which would be subject to royalties, by creating entirely new replacement contracts which differed little from make-up gas arrangements." *Id.* at 33.[12] Similarly, in *Black Butte Coal Co.,* Judge Brimmer noted that "given the simultaneous nature of the two transactions [involved in *Century Offshore*] and the ultimate purchase of the gas [by the same purchaser], the court found that [the parties'] characterization of the payments as "lump sum" was merely a sham." *Black Butte Coal Co.,* 38 F.Supp.2d at 974.

On the contrary, the defendants go to great lengths to convince this Court that the facts at issue in *Century Offshore* are similar to those involved here. According to Interior, both cases involved releasing the original purchaser from the long term contract and the subsequent issuance of replacement contracts for the same gas at a reduced price; both contemplated an ongoing relationship between the original parties; and in both cases MMS "reasonably concluded that portions of the payments were made to reduce the contract price." Reply to Mot. for Summ.J. at 11.

This Court need not decide whether *Century Offshore*'s facts are similar or distinguishable from the facts at issue here because the ruling in *IPAA* is determinative. The defendants argue that this Court can apply the holding in *Century Offshore* to this case because *IPAA* does not conflict with *Century Offshore*. According to Interior, *IPAA* only contemplated those situations not at issue here where

---

12. In another case before Judge Lamberth, *Shell Offshore, Inc. v. Department of Interior,* 997 F.Supp. 23 (D.D.C.1998), Shell Offshore challenged numerous orders by MMS assessing royalties on gas contract settlements similar to those at issue here. Although none of the MMS decisions constituted final agency action, Shell Offshore nonetheless argued that the court should decide the merits of the case because *IPAA* bars Interior from pursuing its claim for royalties on the settlement payments under collateral estoppel principles. In dis-

missing the case for lack of final agency action, Judge Lamberth noted that *IPAA* does not collaterally estop MMS from assessing royalties against Shell Offshore because "whether or not a lump-sum payment is recouped and royalty bearing is a question of fact that depends upon the particulars of the individual transaction; namely whether or not some part of the payment is credited toward gas taken from the ground." *Id.* at 29.

there was no continuing sales relationship between the parties. That argument is not convincing.

In *IPAA*, Interior argued that the "required connection between royalties and physical severance must be temporal only; that is, royalties on [settlement] payments accrue when gas is produced, regardless of whether those [settlement] payments came from the purchaser of the gas." *IPAA*, 92 F.3d at 1259. The court specifically rejected that argument, stating that "when gas is actually severed and sold to a substitute purchaser, the settlement payment does not serve as payment for the gas." *Id.* Under *IPAA*'s interpretation of *Diamond Shamrock* there must be a physical severance of the gas coupled with an actual credit of the payment (settlement or take-or-pay) to the severed gas. Thus, except for the situation (which may or may not have existed in *Century Offshore*) where there is some agreement or contractual arrangement that the settlement payment would be credited as an advance payment for gas to be taken in the future, as opposed to a payment to extinguish past or future contract obligations, the identity of the end purchaser of the "freed-up" gas does not change the result dictated by *IPAA*. Here, there is no agreement that all or a portion of the settlement payment would be applied to future production taken by NGPL or any other purchaser.

### IV. Conclusion

For the reasons stated above, Interior's assessment of royalties on the settlement payment by NGPL to EEX was arbitrary and capricious in light of the Court of Appeals' decision in *IPAA*. As a result, it is hereby

ORDERED that plaintiff's motion for summary judgment is granted; it is

FURTHER ORDERED that defendants' motion for summary judgment is denied; it is

FURTHER ORDERED that if plaintiff wishes to pursue the relief requested in the complaint pertaining to injunctive relief extending beyond this case, as well as attorneys fees and costs, a motion to that effect shall be filed not later than 30 days after the issuance of the mandate from the Court of Appeals, if any appeal be taken, or from the date on which the time for filing an appeal expired.

IT IS SO ORDERED

### *JUDGMENT*

In accordance with Rule 58 of the Federal Rules of Civil Procedure, and the Memorandum Opinion and Order issued this date, judgment is hereby entered in favor of plaintiff, EEX Corporation, and against defendants, United States Department of the Interior, Bruce Babbitt, Secretary of the Interior, and Sylvia V. Baca, Acting Assistant Secretary, Land and Minerals Management, Department of the Interior.

IT IS SO ORDERED.