SHELL OFFSHORE, INC., Shell Oil Company, and Shell Western E & P, Inc. Plaintiffs,

v.

DEPARTMENT OF THE INTERIOR, Bruce Babbitt, Secretary of the Interior, and Bob Armstrong, Assistant Secretary, Defendants.

No. CIV.A. 97–CV–1112RCL, CIV.A. 97–CV–1113RCL, CIV.A. 97–CV–1114RCL, CIV.A. 97–CV–1115RCL, CIV.A. 97–CV–1116RCL, CIV.A. 97–CV–1117RCL, CIV.A. 97–CV–1118RCL, CIV.A. 97–CV–1119RCL, CIV.A. 97–CV–1120RCL, CIV.A. 97–CV–1121RCL.

United States District Court, District of Columbia.

Feb. 13, 1998.

**24**

L. Poe Leggette, Nancy Pell, Jackson & Kelly, Washington, DC, for Plaintiffs.

Lois J. Schiffer, Assistant Attorney General, Ruth Ann Storey Trial Attorney, U.S. Department of Justice, Environmental & Natural Resources Div., Lisa K. Hemmer, Trial Attorney, Geoffrey Heath, Department of the Interior, Washington, DC, for Defendants.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

This matter comes before the court on defendants' motion to dismiss plaintiffs' complaint pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6). For the reasons stated below, defendants' motion is granted.

### I. BACKGROUND AND PRIOR CASES

In these cases,[1] three Shell affiliates— Shell Offshore, Inc., Shell Oil Company and Shell Western E & P, Inc. (hereinafter "Shell") seek declaratory and injunctive relief as they challenge ten orders issued by auditors of the Department of Interior ("DOI"), Mineral Management Service ("MMS"), on April 14 and 30, 1997, which require Shell to pay royalties on lump sum gas contract settlement payments. In the first count ("Unlawful Royalty Assessment"), Shell alleges that DOI's interpretation of the gross proceeds rule as applied against Shell is in excess of defendants' authority under the applicable federal statutes, is arbitrary and capricious, and constitutes an abuse of authority. In the second count ("Collateral Estoppel"), plaintiffs allege that the final judgment in *Independent Petroleum Association of America v. Babbitt,* 92 F.3d 1248 (D.C.Cir.1996) (*"IPAA I "*) bars the defendants from pursuing their claims against plaintiffs because they were for all practical purposes a party to that case. In the third count, plaintiffs claim that exhaustion of administrative remedies is unnecessary as there is no statute requiring exhaustion, and, that to the extent that DOI's rules require exhaustion, the rules are unlawful and arbitrary as applied to Shell.

Defendants seek dismissal of the ten Shell cases for lack of jurisdiction and failure to state a claim upon which relief can be granted. Specifically, they claim that counts I and II must be dismissed as plaintiffs are not appealing from "final agency action" because

---

1. On May 19, 1997, plaintiffs filed ten cases, Civil Action Numbers 97–CV–1112–21 (RCL), challenging ten separate orders to pay. On August 26, 1997, this court entered an order consolidating the cases.

administrative remedies have not been exhausted as required by agency rule. As to count III, they argue that plaintiffs are not entitled to an injunction against MMS for being in privity with the Independent Petroleum Association of America ("IPAA") due to this court's disposition of *Independent Petroleum Association of America v. Babbitt,* 971 F.Supp. 19 (D.D.C.1997) ("*IPAA II* "), in which general injunctive relief for the entire industry was denied.

The storied history of the natural gas industry and long term gas contracts, federal and Indian mineral leasing, and royalties on take-or-pay settlements have previously been addressed in great detail, *see IPAA I,* 92 F.3d at 1251–53, and that history will be discussed in this opinion only to the extent it illuminates the issues under consideration. However, before addressing the substance of defendants' Motion to Dismiss, this court will briefly summarize the relevant portions of the holdings in *IPAA I, In re Century Offshore Management Corp.,* 111 F.3d 443 (6th Cir.1997) ("Century Offshore") and *IPAA II,* as these cases frame the issues that must be addressed in the instant matter.

## A.  IPAA I.

In *IPAA I,* the D.C. Circuit addressed, among other issues, the challenge of IPAA as to whether MMS' decision to assess a $20,000 royalty against Samedan Oil Company was arbitrary and capricious under the APA, 5 U.S.C. § 706(2)(A). Specifically, the court had to decide whether DOI's determination that non-recoupable take-or-pay *settlement* payments from Southern Natural Gas Co. (the purchasor) to Samedan Oil Company (the lessee) were royalty bearing was supportable, given that pursuant to MMS's amending of its regulations to comport with *Diamond Shamrock Exploration Co. v. Hodel,* 853 F.2d 1159, 1164 (5th Cir.1988), royalties do not accrue on take-or-pay *payments* until those payments are specifically allocated to gas that is physically severed from the ground. *IPAA I,* 92 F.3d at 1258–59. "Neither take-or-pay payments nor take or pay settlements are royalty bearing unless and until they are credited toward the purchase of make-up gas." *Id.* at 1260. The court

held that the assessment of royalties against Samedan Oil Company was arbitrary and capricious in light of DOI's adoption of the *Diamond Shamrock* holding. *Id.* at 1260.

In reaching this conclusion, the court noted the Fifth Circuit's heavy emphasis on the link between royalty assessment and the actual removal, or "physical severance," of gas from the ground. *Id.* at 1259 (explaining that under *Diamond Shamrock* royalties are not due on value or even market value, but only on "the value of *production saved, removed or sold* from the leased property") (emphasis in original). The court noted that "a nonrecoupable settlement payment is *never* credited as payment for any gas actually severed from the ground," and, therefore, the vital link between removal and payment that triggers the royalty obligation was missing in the Samedan Oil order. *Id.* at 1259–60. Significantly, Samedan Oil and Southern Natural Gas Company agreed to a complete "buyout," in which the contract was terminated in exchange for a nonrecoverable and nonrefundable payment "in resolution and full and final settlement of any and all obligations and liabilities that Southern has or may have under the Contract." *Id.* at 1254. Even more significantly, on the same day as the settlement, Samedan contracted to sell the gas formerly allocated to Southern to another company at the market price, and none of the gas subject to the settlement was ever sold to Southern. *Id.* Therefore, in *IPAA I,* it was not disputed that the settlement payment at issue was never credited toward make-up gas.

## B.  Century Offshore.

Century Offshore, a lessee of federal lands, had an agreement to sell gas to Enron Gas Marketing, Inc. under a series of fixed price contracts that included take-or-pay provisions. Enron eventually made a lump-sum payment of $12,250,000 to Century in return for being relieved of all obligations under the base contracts. Enron subsequently entered into replacement contracts with Century Offshore based on the current floating market price of gas. Under these replacement contracts, Enron ultimately purchased virtually all of the gas identified in the original agree-

ments, within the same time period. *Century Offshore*, 111 F.3d at 446–47. Again, the issue before the court was whether the lump-sum settlement payment was "properly attributable to 'the amount or value of the production [of natural gas] saved, removed or sold' under § 1337 of the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331–1356 (1996)." *Century Offshore*, 111 F.3d at 445.

In this case, the court did find that the challenged settlement payment was linked to gas production saved, removed or sold, and that the royalties were therefore properly assessed by the MMS auditors. *Id.* at 449. The court determined that the replacement contracts were best characterized as "substituted contracts," in that they were, by their very terms, intended to "replace and supercede" the terminated contracts. *Id.* at 448. Equally important was the fact that Enron purchased virtually all of the gas identified in the earlier contracts. The court noted that "though this gas was not make-up gas, it is analogous to makeup gas in the sense that though it is paid after the payment at issue, it provides a link to production." *Id.* at 449–50 (also remarking that "the lump sum payment contemplated and was the cause of new gas sales to be delivered in the future.") Therefore, "the lump sum payment behaved as an advance payment under a substituted requirements contract. As a result, the payment was for production sold under the statute, and the royalty was payable when the gas was produced." *Id.* at 449. To the extent that the lump-sum payment was allocable to gas taken, royalty payments were due on the lump-sum payment.

Finally, the Sixth Circuit noted that *IPAA I* did not compel a different result because in that case, the gas in the original contract was sold to a third party. Consequently, the dispositive "nexus with production did not exist." *Id.* at 451.

## C. *IPAA II*.

*IPAA II* involved implementation of the mandate of the court of appeals from *IPAA I*. Three aspects of this court's holding are noteworthy in light of the issues under consideration here. First, this court agreed with the Sixth Circuit that there was no conflict between the holdings in *IPAA I* and *Century Offshore*, finding that the factual circumstances underlying the two transactions were sufficiently distinct such that determining that royalties were not owed in the former yet were properly assessed in the latter was not inconsistent. *See IPAA II*, 971 F.Supp. at 32–33. Second, this court held that plaintiff IPAA had no jurisdictional basis on which to sue. This court determined that because the court of appeals held that the May 3, 1993 "Dear Payor" letter was not an agency statement with binding effect, IPAA was not appealing from any final agency action. Furthermore, this court concluded that the mere futility of pursuing administrative remedies could not, without more, create "final agency action," as finality is distinct from exhaustion, and the former is a jurisdictional requirement. *See id.* at 26–30.

Finally, this court addressed whether the court of appeals' mandate as applied to Samedan Oil was broader than simply overturning the single challenged order to pay; namely, whether it covered present or future attempts to assess royalties against Samedan in this circuit or elsewhere. *IPAA II*, 971 F.Supp. at 31–35. This court held that as to the other pending (and therefore non-final) *Samedan* administrative appeals, defendants were collaterally estopped from pursuing the royalty claims, and Samedan's motion for a permanent injunction was granted. In reaching this conclusion, this court noted that "it appears that the court of appeals meant to include other circumstances—other than simple buyouts—where logic would dictate the exact same result." *Id.* at 32. The court noted that all four pending Samedan appeals appeared to deal with buyouts—in which the purchaser of the gas completely and permanently walks away from the contract and never receives any gas—and therefore, the challenged transactions "clearly fall under the shadow of IPAA." *Id.* at 32. However, in granting the permanent injunction, this court did not conclude that there was *no* possible contractual arrangement or device under which settlement payments could be royalty bearing, only that such a contractual arrangement did not appear to be presented in the four Samedan appeals. *See id.* at 32–33.

Rather, permanent injunctive relief was demanded under collateral estoppel principles on account of the government' express intent to relitigate the same issue on virtually identical facts in various circuits around the country. *Id.* at 33–34 (citing *United States v. Stauffer Chemical Co.,* 464 U.S. 165, 104 S.Ct. 575, 78 L.Ed.2d 388 (1984).

## II. *ANALYSIS*

A. Plaintiffs Must Exhaust Administrative Remedies Before Challenging the Administrative Action in Court

In its complaint, Shell challenges the ten royalty assessment orders issued by the Houston Compliance Division (HCD) of MMS in April 1997. Shell has filed administrative appeals of these orders and these appeals are currently pending. Defendants' Motion to Dismiss as to counts one and two of the ten suits asserts that because the appeals have not been ruled upon, there is no "final agency action" such that this court may exert jurisdiction over these cases.

Shell's complaints acknowledge that jurisdiction over this matter arises under the Administrative Procedure Act, 5 U.S.C. §§ 701–06. When a party seeks to challenge an agency policy or practice by which they are adversely affected or aggrieved in the courts, that party may seek judicial review under section 10(a) of the APA. *See* 5 U.S.C. § 702. When review is not sought pursuant to specific authorization in a substantive statute, but only under the general review provisions of the APA, the action in question must be "final agency action." *See* 5 U.S.C. § 704; *Lujan v. National Wildlife Federation,* 497 U.S. 871, 881–84, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). When a party seeks judicial review under section 10(c) of the APA, that party is required to exhaust all administrative remedies mandated either by statute or agency rule. *See Darby v. Cisneros,* 509 U.S. 137, 147, 153, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993) (requiring exhaustion of available administrative appeals prior to judicial review if that remedy is required by statute or agency rule and the effect of the initial decision is inoperative during the period of appeal).

With regard to the issuance of orders to pay royalties by DOI under the Outer Continental Shelf Lands Act ("OCSLA"), the administrative process operates in the following manner. The Federal Oil and Gas Royalty Management Act of 1982, 30 U.S.C. § 1701 *et seq.,* directs DOI to ensure the "prompt and proper collection and disbursement of oil and gas revenues owed to the United States and Indian lessors . . . ." 30 U.S.C. § 1701(b)(3). When auditors find royalties to be due and unpaid, MMS Regional Compliance Divisions issue orders to pay or to recalculate royalties pursuant to specified instructions. These orders to pay are appealable to the MMS director, *see* 30 C.F.R. § 290; in fact, DOI rules specifically require that lessees permit the agency to adjudicate all royalty valuation issues prior to seeking judicial review.

In order to exhaust administrative remedies, a decision or order of MMS's Royalty Management Program *must be appealed* pursuant to 30 CFR part 290 to the Director . . . and subsequently to the Interior Board of Land Appeals under 30 CFR part 290.7 and 43 CFR part 4 . . .

30 C.F.R. § 243.3 (emphasis added). During the period of administrative review, the obligation to pay or comply is suspended. 30 C.F.R. 243.2 ("Compliance with any orders or decisions issued by . . . [MMS] . . . including orders for payment of royalty deficiencies . . . shall be suspended by reason of an appeal having been taken pursuant to 30 CFR part 290."). The decision of the IBLA constitutes judicially reviewable "final agency action" under the APA, 5 U.S.C. § 704. *See* 43 C.F.R. §§ 4.403, 4.21(c). Also, an MMS Director's decision may be reviewed and affirmed, reversed or modified by an Assistant Secretary; those decisions are not reviewable in the IBLA and are final agency action subject to judicial review. The Secretary retains reserved authority to act in any matter before the agency. 43 C.F.R. § 4.5.

The D.C. Circuit has recently addressed the necessity of exhaustion of administrative remedies before challenging an administrative action in court in a case on all fours with these cases. In *Marine Mammal Conservancy, Inc. v. Department of Agriculture,* 134 F.3d 409, (D.C.Cir.1998) (Randolph,

J.), Marine Mammal Conservancy brought a case for judicial review rather than appeal an adverse decision of an ALJ to the Department of Agriculture's judicial officer. The Department defended on the basis of failure to exhaust administrative remedies. The Department's rules specifically required that as a condition to judicial review, an aggrieved party must first appeal to a judicial officer, and, also, that finality of the ALJ determination is suspended during the period pending appeal. *Id.* at 411–13. In reaching its conclusion that exhaustion of administrative remedies was a prerequisite for jurisdiction, the court noted:

> *Darby* held that in cases in which the APA applies, requiring a party to exhaust administrative remedies is not a matter of judicial discretion. Rather, "an appeal to 'superior agency authority' is a prerequisite to judicial review *only* when expressly required by statute or when agency rule requires appeal before review and administrative action is made inoperative pending review."

*Id.* (citing *Darby*, 509 U.S. at 154). The dismissal of the petition for review based upon Marine Mammal's failure to exhaust its administrative remedies effectively captures the jurisdictional exhaustion question that this court has been called upon to address. First, the agency regulation in question, 30 C.F.R. § 243.3, deems final for purposes of judicial review only decisions appealed to the Director. Second, agency regulations explicitly make the administrative orders to pay inoperative during the period pending appeal. *See* 30 C.F.R. § 243.2; 43 C.F.R. § 4.21. Therefore, just as in *Marine Mammal,* Shell's "failure to prosecute an administrative appeal would thus appear to doom its petition." *Marine Mammal,* at 411.

Though *Darby* holds that in cases in which the APA applies, the requirement of exhaustion is not a matter of judicial discretion, *see Marine Mammal,* at 411–12, some of the prudential considerations underlying exhaustion are implicated in the instant cases, and merit brief discussion. First, the legal landscape concerning royalties on take-or-pay settlement payments has been substantially clarified since the HCD compliance directors received the instructions on which the April 1997 were based, and the agency should be given the opportunity to reconsider its general position and the ten orders to pay in light of these changes. Second, whether or not royalties are owed on a given contract settlement is dependent on the facts underlying the transaction, and the agency should be given the opportunity to gather evidence and consider the entirety of a complicated factual record in order to determine whether any portion of the challenged settlement payments were specifically allotted to gas that was physically severed from the ground, and therefore royalty bearing. *IPAA I,* 92 F.3d 1248 (D.C.Cir.1996).

1. Defendants Should Be Given the Opportunity to Reconsider the Validity of the April 1997 Orders in Light of Intervening Case Law.

In defendants' Motion to Dismiss, they assert that "the auditors who issued the orders to Shell had not yet received directions regarding the effect of the D.C. Circuit's decision in *IPAA* [I], which pre-dated the orders." Defendant's Motion to Dismiss at 18. Nor, defendants allege, could the auditors have received directions as to the meaning of the Sixth Circuit's *Century Offshore* decision, as nine of the ten orders to pay were issued on the same date that case was decided (which defendants allege to be a coincidence) and the motion for rehearing in that case had not been ruled upon. And, this court's ruling in *IPAA II* post-dated the issuance of all the Shell orders. It is therefore at best an understatement to say that the legal landscape regarding the royalty impact of take-or-pay settlement payments has been dramatically clarified, if not altered, since the time the auditors issued their orders (or, more accurately, received their instructions concerning these orders). In light of the fact that so much has transpired, it makes sense from the perspective of judicial economy to wait for the administrative process to reach its completion, since the agency may yet determine that some or all of the ten orders are improper under *IPAA I,* or that the assessments were too high, obviating the need for judicial review. *See McKart v. United States,* 395 U.S. 185, 194, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969) (noting that the

exhaustion requirement permits top managers to correct the mistakes made at lower levels); *Oglesby v. Department of the Army,* 920 F.2d 57, 61 (D.C.Cir.1990) (same). As a matter of judicial economy, MMS and DOI should be given the opportunity to carefully consider the clear language of the D.C. Circuit opinion concerning the requirement of a "nexus" between the severance of gas from the ground and a settlement payment to trigger the lessee's royalty obligation, this court's opinion implementing the D.C. Circuit's mandate, and the *Century Offshore* decision as it reconsiders the administrative appeals.

2. The Agency Should Be Given the Opportunity to Develop a Complete Factual Record to Determine Whether or Not These Transactions Are Royalty Bearing

It is unequivocally the case that *some* gas contract settlement payments *are* royalty bearing. *See Century Offshore,* 111 F.3d at 449–50; *IPAA I,* 92 F.3d at 1260 (The relevant question .. is whether or not the funds making up the payment actually pay for any gas severed from the ground. *When take-or-pay payments (or settlement payments) are recouped, those funds do pay for severed gas.*) (emphasis added). And, in *IPAA II,* this court noted:

> To begin, there is no conflict between *IPAA* [I] and *Century* with regard to the issue of non-recoupable take-or-pay payments.... Just as IPAA found that no royalties were due until make-up gas was taken—an occurrence providing the necessary link between payments and the physical severance of gas—so, too, did *Century* find that though the gas at issue was not technically make-up gas, it was "analogous" to make-up gas in that it had the requisite link to production—the link required by IPAA [I].

*IPAA II,* 971 F.Supp. at 32–33 (citing *Century Offshore,* 111 F.3d at 449–50). Whether or not a lump-sum settlement payment is "recouped" and royalty bearing is a question of fact that depends upon the particulars of the individual transaction; namely, whether or not some part of the payment is credited toward gas taken from the ground.

The government argues that some or all of the contested *Shell* transactions may be royalty bearing because either "a) Shell terminated its contract in return for a lump sum payment and thereafter entered into subsequent contracts with the same purchasers for the same gas or, b) Shell terminated its contract with its purchasers in return for a lump sum payment and thereafter sold the relevant production to a Shell affiliate created in 1986, Shell Gas Trading Company, which may then have then resold the same production to the same purchasers under amended pricing provisions." Motion to Dismiss at 4. Shell, by contrast, argues that the ten Shell transactions are all contract settlement buyouts, buydowns and take-or-pay settlement proceeds that have already been deemed to be non-royalty bearing under *IPAA I.* In its Opposition to the Motion to Dismiss, Shell goes to considerable lengths to explain how each of the ten contested orders to pay cannot possibly be royalty bearing based upon the D.C. Circuit's holding in *IPAA I,* even in light of the subsequent *Century Offshore* holding. Defendants' two memoranda devote an equal or greater number of pages to demonstrating the opposite.

Whether or not the settlement payments at issue should be subject to royalty obligations or not is, to a large extent, dependent on a large number of factual determinations that may be different in each transaction. These determinations include, but by no means are limited to: to whom was the gas subject to the settlement ultimately sold; the quantity of the gas ultimately sold to the subsequent purchaser; the date(s) of delivery of the gas identified in the settled contract; the price per unit of the gas ultimately sold, and how that price compares with the open market price of gas at the time of the sale (or, more specifically to what extent the settlement payment appears to be part payment for gas actually delivered); what is the precise relationship between Shell Offshore and the wholly-owned Shell affiliate, Shell Gas Trading Company; and, to whom did Shell Gas Trading Company deliver its gas under the replacement contracts.

In light of the large number of factual matters that may be dispositive on whether

DOI should be precluded from collecting royalties on the lump sum settlement payments, the complexity of the issues in dispute, and the necessity for this court to have a complete administrative record if it is called upon to exercise its judicial review function, requiring exhaustion of administrative remedies is appropriate. MMS should be given the opportunity to develop a complete factual record and apply agency expertise in reconsidering the orders to pay. *See, e.g., McKart,* 395 U.S. at 194 (stating that "it is normally desirable to let the agency develop the necessary factual background upon which decisions should be based" and noting the importance of utilizing agency expertise); *Blitz v. Donovan,* 740 F.2d 1241, 1248 n. 12 (D.C.Cir.1984) (collecting cases in support of the proposition that exhaustion is required "to develop a concrete factual record for judicial review"); *see also Phillips Petroleum Co. v. Lujan,* 760 F.Supp. 882, 883 (N.D.Okl. 1989) (noting that it was the absence of the need for special agency expertise, and the fact that nothing would be gained by developing a factual record, that allowed the court to disregard exhaustion). Furthermore, the parties' memoranda indicate considerable dispute as to whether all documents necessary for MMS to make the appropriate findings of fact have been provided at this time. *See, e.g.,* Defendants' Motion to Dismiss at 35; Plaintiffs' Opposition at 19–20. This court is reluctant to dive headfirst into a pool that appears to be half-empty. If this court is ultimately called upon to exercise its power of judicial review to determine whether the orders to pay are "arbitrary and capricious" and unlawful under *IPAA I,* this court should be presented with a *complete* administrative record. *See McKart,* 395 U.S. at 194 (noting that judicial review may be hindered by the inability of the agency to make a factual record). The existence of an ongoing document production dispute at the administrative level makes this matter a poor candidate for bypassing the exhaustion requirement, were that option even available under *Darby.*

■ The fact that this court is requiring Shell to exhaust administrative remedies and thereby create reviewable "final agency action" should not be surprising; in fact, the court effectively announced this result in *IPAA II* when it stated:

> IPAA and the others [which presumptively would include Shell] do not face any final actions which they may challenge. They are faced with no final rule which would force their members to pay royalties— leaving this court without jurisdiction to act at this time. Presumably, if the agency tried to implement the procedure struck down in IPAA through an administrative adjudicatory process, the targeted companies would then be faced with final agency action and could sue for appropriate relief in this court.

*IPAA II,* 971 F.Supp. at 30. This court recognized that the road to judicial review could not be short-circuited even in light of the substantial intransigence shown by DOI. *Darby* explicitly holds that "an appeal to superior agency authority is a prerequisite to judicial review ... when an agency rule requires appeal for review and the administrative action is made inoperative pending that review." 509 U.S. at 154. Having not completed the administrative adjudicatory process, this court is without jurisdiction to exercise its powers of judicial review.

**B. Plaintiffs' Claims That Finality Exists Absent Exhaustion**

Based upon the foregoing, it is apparent that both as a matter of law and in the interests of judicial efficiency, exhaustion of administrative appeals by Shell is required before this court may exercise its power of judicial review over the orders to pay. However, the long and tortured history of the *Shell* cases and other industry litigation over the royalty implications of take-or-pay settlements make the jurisdictional question more complicated. First, plaintiffs claim that an earlier "final agency action" of DOI—*Shell Offshore Inc.,* MMS–91–0087–OCS (Sept. 2, 1994)—is the basis upon which there has been "final agency action," and that this earlier expression of DOI's "take or pay" policy permits this court to review the ten challenged orders of April 1997. Second, they allege that the "clear right" exception to finality is implicated. Third, Shell claims that the April 1997 orders are now final, noting that futility is an recognized exception

to the exhaustion requirement, and/or that futility can create final agency action. Fourth, they argue that lessees of federal and Indian lands may challenge royalty orders and decisions in federal courts under section 23(a) of the OCS Lands Act (the "citizen suit" provision), 43 U.S.C. § 1349(a)(1). Each of these arguments alleging that this court may exercise jurisdiction over this matter absent exhaustion will be considered in turn.[2]

1. The Shell Companies Have Not Already Had Their "Final Agency Action" Prior to the 1997 Orders to Pay

Shell's claim that there has been "final agency action" looks not to the ten instant orders to pay, for which administrative appeals are concededly still pending, but rather to a previous order to pay and final decision issued against Shell Offshore in September 1994. Shell asserts the presence of reviewable final agency action by aligning itself with Samedan Oil (who did receive general permanent injunctive relief in *IPAA II* ), stating "[l]ike Samedan, Shell Offshore has had its 'final agency action. . . .' " Therefore, just as Samedan's final decision gave this Court jurisdiction to address Samedan's pending administrative appeals, so too does *Shell Offshore* give the Court jurisdiction to address the companies' pending administrative appeals. Plaintiffs' Motion to Dismiss at 6. To understand how plaintiffs arrive at this conclusion, a step back in time is necessary.

The assessment of royalties against Samedan Oil was brought as one of two test cases for judicial review of the May 3, 1993 "Dear Payor" letter which cited MMS's position on contract royalty obligations and directed MMS auditors to assess royalties on lump sum payments that could be allocated to future production when that production took place. The other test case involved Shell Offshore. In Samedan Oil, the Department, applying the policy outlined in the May 3 "Dear Payor" letter, levied a $20,000 royalty

on a settlement payment received by Samedan from Southern Natural Gas Company. Samedan took an administrative appeal, and the assessment order was subsequently upheld by Assistant Secretary Ada A. Deer, thereby creating "final agency action" upon which this court could, and did, exercise judicial review. *See Samedan Oil Corp.*, MMS–94–0003–IND (September 16, 1994). Similarly, in *Shell Offshore*, Assistant Secretary Bob Armstrong issued a final administrative decision upholding that royalty order, which would have permitted *Shell* to appeal that decision in this court in the fall of 1994. *See Shell Offshore Inc.*, MMS–91–0087–OCS (September 2, 1994).

■ The similarity between Samedan Oil's and Shell Offshore's position with regard to "final agency action" and jurisdiction ends there. After receiving its unfavorable decision from the Assistant Secretary, Samedan Oil proceeded to litigate its take-or-pay settlement royalty assessment, first in this court and then in the court of appeals, at which point it received the mandate which led this court to grant the broad-based relief awarded in *IPAA II*. Shell Offshore, on the other hand, chose not to proceed in this court, instead electing to settle its royalty claim with DOI. *See* Letter from Michael E. Coney, Attorney for Shell Offshore, to Peter J. Schaumberg, Assistant Solicitor, DOI (November 7, 1994) ("Shell Offshore Settlement") ¶ 1 ("Shell agrees to take no further judicial or administrative appeal of MMS–91–0087–OCS.") It is not disputed that Shell Offshore would have been free to file suit in this court with respect to the affirmance of the order to pay by Assistant Secretary Armstrong in 1994. However, the existence of appealable final agency action on the 1994 order to pay does not *a fortiori* create "final agency action" with regard to the ten 1997 orders to pay.

---

**2.** Plaintiffs also argued that requiring the companies to litigate issues previously decided in *IPAA I* constitutes an arbitrary and capricious abuse of the Department's authority. However, this collateral estoppel argument was predicated upon this court's granting of plaintiffs' Motion for Reconsideration in *IPAA II*. Having now denied this

motion, *see* Memorandum Opinion and Order on Plaintiff's Motion to Alter or Amend Judgment, (February 13, 1998) (*"IPAA III "*), this court need not consider this basis for taking jurisdiction and reviewing the merits of the preliminary injunction motions.

This conclusion is borne out by plaintiffs' own construction of the November 7, 1994 Shell Offshore settlement agreement. In their Opposition to the Motion to Dismiss, plaintiffs admit that "Shell Offshore and the Department reached an agreement under which Shell Offshore would pay the small sum assessed under the decision *and not challenge the order* in exchange for the Department's agreement not to treat Shell's payment and forbearance as a bar to challenging the Department's future attempts to assess royalties on gas contract settlements." Plaintiffs' Opposition at 2 n. 2. Specifically, Shell stated that by agreeing to pay its royalty assessment that it did not waive its "theories, arguments, interpretations and positions on accessibility of royalty on gas contract statements" with respect to "an assessment of royalty on any other SOI gas contract settlement ... in any future or pending orders ...." Shell Offshore Settlement ¶ 5. As this court interprets this agreement, Shell is certainly entitled to judicial review of the April orders once they become "final agency action," as there was no bar to challenging future attempts to assess royalties. But, to the extent that plaintiffs are challenging the agency's "take-or-pay policy" as that policy was announced in the 1994 order to pay, or otherwise relying upon that adverse 1994 administrative decision as a basis for present judicial review, they would be violating the terms of their agreement with DOI.

More importantly; however, this court is not convinced that the 1994 order can, in 1998, properly be described as either "the Secretary's take-or-pay policy" or "the current interpretation of the gross proceeds rule." Plaintiffs' Opposition at 6–7. As discussed in some detail above, three years have passed and at least two very significant Court of Appeals opinions have been handed down since the 1994 Shell Offshore order was upheld by the Assistant Secretary. It is difficult to argue that the past adjudication, for present purposes, is an action by which "rights or obligations have been determined," or from which "legal consequences will flow." *Bennett v. Spear,* 520 U.S. 154, ——, 117 S.Ct. 1154, 1168, 137 L.Ed.2d 281 (1997) (citations omitted). Defendants ask this court to allow "superior agency authority" to be

given the opportunity to decide a course of action based upon these intervening judicial decisions, and, as explained above, that request is well-grounded in both the law and the prudential presumptions underlying the exhaustion requirement. Furthermore, there may be factual distinctions between the 1994 adjudication and some or all of the ten instant orders such that even if the 1994 order to pay had been considered on judicial review to be an arbitrary and capricious application of the gross proceeds rule, that finding would not necessarily mean that the instant transactions are not be royalty bearing.

Plaintiffs cite *Capitol Technical Servs., Inc. v. FAA,* 791 F.2d 964, 968 (D.C.Cir.1986) for the proposition that "a general policy announced in a particular adjudication may be challenged even after an appeal of the particular adjudication becomes moot." and *National Automatic Laundry and Cleaning Council v. Shultz,* 443 F.2d 689, 702 (D.C.Cir. 1971) to note that the courts have permitted "a trade association, even before its members faced individual enforcement actions, to challenge an interpretation announced in a letter from the agency addressing a summary of facts typical of the membership." Plaintiffs' Opposition at 10. But neither of these cases capture the situation presented here. In those cases, the agency interpretation announced in the previous adjudication was not subject to further reconsideration by the agency. *See Capitol Technical Servs.,* 791 F.2d at 969 ("there can be no question that the agency action has taken final form; indeed, the agency has not even suggested that any further policy evolution could be expected"); *National Automatic Laundry,* 443 F.2d at 702 (noting that for finality, an interpretation should not be subject to reconsideration). Here, MMS unambiguously and consistently states that they need to and will "respond administratively to the various judicial rulings that have been issued since 1994 ..." Defendants' Reply at 9. Therefore, plaintiffs' reliance on the aforementioned cases is misplaced.

Furthermore, in *Capitol Technical Services,* the court noted, "[i]n the instant case, too, we are confronted with purely legal

questions .... The factual context ... is not necessary to our analysis ...." 791 F.2d at 969. In considering the instant orders to pay, by contrast, that is not the case. The determination as to whether these settlements, or a portion of the settlements are royalty bearing is not purely legal; factual issues concerning the contracts and subsequent activity by the lessees and purchasers are central to determining whether the orders to pay were issued in excess of agency authority.

For all the above reasons, this court will not permit judicial review of the ten instant orders to pay to the extent that plaintiffs wish to utilize to the 1994 decision in *Shell Offshore* as a "general policy announced in a particular adjudication." Plaintiffs' Opposition at 9.

2. The "Clear Right" Exception to Finality Does Not Apply

[5] Plaintiffs state that this circuit permits an exception to finality under the "clear right" doctrine, which permits a court to take jurisdiction before "final agency action" when presented with either an outright violation of a clear statutory provision, or a violation of basic rights established by a structural flaw. *See Telecommunications Research & Action v. FCC,* 750 F.2d 70, 79 (D.C.Cir.1984) (quoting *Association of National Advertisers, Inc. v. FTC,* 627 F.2d 1151, 1180 (D.C.Cir.1979)) (Leventhal, J. concurring). However, this court does not find the "clear right" exception to be implicated in this case. Most significantly, Judge Leventhal's formulation explicitly directs that the exception must "not requir[e] in any way a consideration of the interrelated aspects of the merits." *Id.* Here, the merits are indisputably at issue, as it is the factual determination as to "whether or not the funds making up the payment actually pay for any gas severed from the ground," *IPAA I,* 92 F.3d at 1260, that will ultimately determine whether the orders to pay must be withdrawn or modified. That factor, combined with the fact that the clear right exception is applicable "[o]nly in rare instances," *National Advertisers,* 627 F.2d at 1178, directs this court to not premise jurisdiction on that basis.

3. The Futility Exception Does Not Apply

As to whether finality exists because it is futile for the companies to appeal the take-or-pay policy administratively, that contention is rejected, and this court directs plaintiffs to its discussion of this subject in *IPAA II,* 971 F.Supp. at 27–30, and this court's opinion denying plaintiffs' motion for reconsideration in *IPAA II,* issued this date ("*Independent Petroleum Ass'n of America v. Babbit, IPAA III,* 178 F.R.D. 323 (D.D.C. 1998)").

Whether the futility exception to exhaustion applies, *see, Marine Mammal* at 412–13, this court addresses that claim by stating that it now stands less convinced than it did in *IPAA II* that pursuing administrative appeals would be futile, for two reasons: first, because defendants now admit that withdrawing or modifying the orders to pay is a distinct possibility, and, second, unlike the Samedan appeals, which all appeared to be straight buyouts, there are factual matters that must be addressed as to whether some of the transactions may be royalty bearing.

As to the possibility that the orders to pay may ultimately be withdrawn or modified in light of *IPAA I,* there is a difference in the approach the Department is taking in the Shell appeals as compared with their approach toward the implementation of the court of appeals' mandate. In *IPAA II,* this court characterized "the government's briefing in this case as nothing short of defiant in illustrating the agency's plans to continue collecting royalties on take-or-pay settlements." 971 F.Supp. at 28. In the present matter, however, there seems to be (at long last) some recognition on the part of the government that to the extent that take-or-pay settlement payments are not actually paying for or credited toward gas removed from the ground, the lessees proceeds on that settlement are not royalty bearing. *See* Defendants' Motion to Dismiss at 19 (noting that the ultimate result here is not foreordained). Defendants also note in their Motion to Dismiss that Shell's assertion of futility is based on a presumption that the decision makers at DOI "will simply endorse unconditionally the analysis and conclusions in the auditors' ten orders to Shell affili-

ates." Defendants' Motion to Dismiss at 25. This court optimistically reads defendants' characterization of plaintiffs' concern about intransigence as unfounded as an indication that they will not pursue a policy of "defiant" unconditional endorsement. DOI asks for the opportunity to respond to judicial rulings on the issue and determine its policy direction, which is a reasonable request. This court agrees that under the present circumstances "[i]t is not futile for the agency to be permitted the opportunity to respond to judicial rulings on issues and determine its policy direction." Defendants' Reply at 13–14. *See Randolph–Sheppard Vendors of America v. Weinberger*, 795 F.2d 90, 105–06 (D.C.Cir.1986) (noting that for futility an appeal must be "clearly useless" or the agency must demonstrate an unwillingness to reconsider the issue).

■ Second, futility of administrative review is not present here because there is some possibility that the orders to pay were properly issued and that the settlement proceeds are royalty-bearing, either in part or in whole. Defendants contend that some of the take-or-pay settlements at issue may have been credited toward gas actually taken from the ground, and therefore do not fall under the umbrella of the arbitrary and capricious order invalidated in *IPAA I*. MMS regulations state, "[t]he MMS ... will carefully review all situations to ensure that lessees do not improperly attempt to use contractual devices to avoid royalties by denominating as take-or-pay or advance payments other consideration which is part of the gross proceeds for production." 53 Fed.Reg. 45084 (1988). It is not "futile" for the agency to be allowed to make a factual record and determine whether a company's transaction is an improper attempt to use a contractual device to avoid royalties.

Finally, as this circuit recently noted in *Marine Mammal*, "[d]oubt about the success of prosecuting an administrative appeal is no reason to excuse a litigant's failure to make the attempt." *Marine Mammal* at 413. While plaintiffs may have their doubts as to

the final result at the administrative level, this court is directing them to make the attempt.

4. Jurisdiction Cannot be Premised Under the "Citizen Suit" Provision of OCSLA

Shell argues that the citizen suit provision of the Outer Continental Shelf Lands Act, 43 U.S.C. § 1349(a), gives this court jurisdiction to review the current interpretation of the take-or-pay rule and/or the ten orders to pay issued against the Shell plaintiffs. By its terms, section 23(a) permits "any person having a valid legal interest which is or may be adversely affected" to sue "any person, including the United States, and any other government instrumentality or agency" to "compel compliance" with the Act. Plaintiffs contend that section 23(a) is a provision that make "agency action" "reviewable by statute" within the meaning of 5 U.S.C. § 704, and therefore finality is not required. Section 23(a) does not require that actions or decisions challenged in a suit be final.

■ The Fifth Circuit has recently addressed the interplay between the APA and the citizen suit provision of OCSLA, and this court is in agreement both with its conclusion and the rationale underlying it. In *OXY USA, Inc. v. Babbitt*, 122 F.3d 251, 256–59 (5th Cir.1997) plaintiffs sought to invoke the citizen suit provision "as an avenue of obtaining judicial review of OSCLA-related agency decisions that is wholly independent of the judicial review procedures set forth in the APA." [3] *Id.* at 258. The court held:

> We do not think that Congress intended for the citizen suit provision to operate either as a means of obtaining "umbrella" review for a series of agency decisions that were or will be otherwise subject to judicial review of the APA, *or as an express avenue for appealing to the district court an initial agency decision that is subject to further review within the agency.* To hold otherwise would be to interpret the citizen suit provision as implicitly repealing the APA with respect to such agency action.

**3.** This court finds OXY to be especially appropriate in that plaintiffs purported to challenge an alleged "final determination" that did not consist

of any final agency action outside of a series of past DOI decisions. *See id.* at 257.

*Id.* (emphasis added). In reaching this conclusion, the Fifth Circuit relied upon Supreme Court's recent treatment of the citizen suit provision of the Endangered Species Act in *Bennett v. Spear* which noted that allowing citizen suits would constitute "a wholesale abrogation of the APA's 'final agency action' requirement." 520 U.S. at ——, 117 S.Ct. at 1166–67.

Were Shell's construction of the citizen suit provision correct, and the Fifth Circuit wrong, the APA's requirement of "final agency action" would be rendered without any legal effect. Any adverse agency action against a lessee could immediately be litigated in the district court in lieu of, or simultaneous with, any administrative appeals. All the prudential considerations underlying exhaustion, including agency independence and autonomy, the ability to assemble an administrative record, and the opportunity for an agency to correct its own errors and obviate the need for judicial review, would be cast aside. *See McKart*, 395 U.S. at 194–95. Furthermore, the federal courts would be become the court of first resort for a large new class of litigants. Plaintiffs dismiss the concern that the floodgates of litigation will be left ajar by stating that courts will normally impose a requirement of exhaustion of remedies as a matter of judicial discretion. Such a solution is hardly comforting, however, as it means that not only would the courts have to address suits by all lessees who received an unfavorable ruling from a lower-level MMS auditor, but also that these suits would invariably be followed by an even greater number of motions arguing whether or not the judicial discretion requiring exhaustion should be exercised. This court will follow the holding of the Fifth Circuit in concluding that the citizen suit provision of OSCLA does not repeal the APA, and that therefore, plaintiffs may not use it as a mechanism to bypass the administrative review process.

## III. *CONCLUSION*

This court is not unmindful of, and to some degree shares, the frustration experienced by Samedan Oil, Shell, IPAA, Texaco and the other gas companies that have been litigating the battle over take-or-pay settlement royalties ever since DOI adopted the holding of *Diamond Shamrock*. In declining to grant jurisdiction to IPAA in *IPAA II* and provide industry-wide injunctive relief, this court stated, "[p]erhaps losing 40 or 50 of these cases in this district might convince MMS to engage in a new rulemaking or return to its pre-IPAA policies." *IPAA II*, 971 F.Supp. at 30. In making this statement, this court was not desirous that this rather extreme course of events would come to pass. However, as of the date of this memorandum opinion, thirteen cases have already been filed with this court,[4] and while defendants have neither "won" nor "lost" these cases through this opinion, this court is concerned that before too long it well may be one-third of the way along toward its prediction.

Defendants state that "this court may not preclude the agency from engaging in an investigation into the nature of gas settlement transactions involved in the ten Shell orders to determine whether they fall within the fact patterns which this Court has stated are not in conflict with the D.C. Circuit's analysis." Under *Darby*, the APA, and prevailing exhaustion/finality analysis, this is a correct statement of the law, and for the reasons stated in this opinion this court must decline to take jurisdiction. However, to the extent the above statement actually means "this court may not preclude the agency from trying to pigeonhole the ten contract settlements into a *Century Offshore* fact pattern such that we can declare them royalty bearing, and in so doing act in an arbitrary and capricious manner," this court must voice its concern. Defendants are not entitled to use exhaustion as a means to find some mechanism whereby they might endeavor to avoid the unmistakable consequences of the court of appeals' holding in *IPAA I*.

DOI amended the gross proceeds rule to be compatible with *Diamond Shamrock*. *Diamond Shamrock* requires a nexus between

---

4. This number takes into consideration *Samedan Oil*, the ten Shell cases, *Texaco Inc. v. Department of Interior*, 97–CV–1269 (RCL), and *Rio Petrol, Inc. v. Kenneth R. Vogel*, 97–CV–1819 (RCL).

payments and the physical severance of gas to trigger a royalty obligation. To the extent that a company is using creative contractual devices to avoid make-up contracts that should be subject to royalties, the assessment of royalties on the settlement proceeds is appropriate. However, if the funds making up the settlement payment do not actually pay for any gas taken from the ground, no royalties should accrue on those payments. That is what this circuit held in *IPAA I*. "The relevant question .... is whether or not the funds making up the payment actually pay for any gas severed from the ground." *IPAA I*, 92 F.3d at 1248. Neither *IPAA II* nor *Century Offshore* say anything to the contrary. This court trusts that in dismissing these cases and granting DOI's request to allow its administrative procedures to run their course, review intervening law, develop the factual record, and determine "what, if anything, within Shell's fact patterns fits within *permissible* royalty collection" (emphasis added) this circuit will not again be compelled to reach a conclusion that the agency action was arbitrary and capricious.

A separate order shall issue this date.

### ORDER

This matter comes before the court on Defendants' Motion to Dismiss plaintiffs' complaints pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6). For the reasons stated in the accompanying Memorandum Opinion, defendants' motion is GRANTED, and it is further

ORDERED that these cases are hereby DISMISSED for failure to exhaust available administrative remedies, and it is further

ORDERED that plaintiffs' Motion for Preliminary Injunction is DENIED AS MOOT.

SO ORDERED.